STATE OF CONNECTICUT *v.* BETH ANN
CARPENTER
(SC 16854)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 7—officially released October 11, 2005

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Kevin T. Kane*, state's attorney, with whom was *Peter A. McShane*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Beth Ann Carpenter, appeals from the judgment of conviction, rendered after a jury trial, of capital felony in violation of General Statutes § 53a-54b (2), murder as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-54a (a) and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. On appeal, the defendant claims that the trial court improperly: (1) excluded expert testimony regarding codependent relationships; (2) admitted hearsay evidence as to the defendant's purported motive; (3) admitted hearsay evidence disclosing the existence of a conspiracy; (4) excluded evidence pertaining to the gunman's state of mind; (5) excluded evidence of an alleged confession by the gunman's son; (6) excluded evidence of the defendant's state of mind prior to the murder; and (7) charged the jury on the elements of murder for hire. We affirm the judgment of the trial court.

A jury reasonably could have found the following facts. On March 10, 1994, at approximately 7:30 p.m., travelers on Interstate 95 discovered the body of the victim, Anson B. "Buzz" Clinton III, lying in the roadway of exit seventy-two, known as the Rocky Neck connector, in the town of East Lyme. The victim had died as a result of multiple gunshot wounds to his head and upper body.

In 1992, the victim met the defendant's sister, Kim Carpenter, at a bar where he performed as an exotic dancer. At the time, Kim and her two year old daughter, Rebecca Carpenter, lived with the defendant and their parents, Richard Carpenter and Cynthia Carpenter, at the Carpenters' home in Ledyard. Shortly after Kim met the victim, however, she moved out of the Carpenters' home and went to live with the victim at his parents' home in Old Lyme, showing no apparent concern for

Rebecca and leaving her in the care of the Carpenters for significant periods of time.

Thereafter, Cynthia Carpenter and the defendant, an attorney licensed to practice law in Connecticut, filed an application in the Probate Court seeking Kim's removal as guardian of Rebecca on the ground that Kim had abandoned Rebecca when she went to live with the victim. Cynthia Carpenter also filed a separate application for immediate temporary custody of Rebecca. According to the applications, Rebecca was developmentally delayed and required special care that Kim was not providing.[1]

In October, 1992, the court issued an ex parte order granting Cynthia Carpenter immediate temporary custody of Rebecca. The court also appointed a guardian ad litem to represent Rebecca's interests. In December, 1992, following an investigation by the department of children and families and upon the recommendation of the guardian ad litem, the Probate Court reversed the temporary order and returned guardianship and custody of Rebecca to Kim after she took certain court-ordered steps to improve her parenting skills.

In January, 1993, Kim married the victim. Throughout that year, Cynthia Carpenter and the defendant continued to pursue litigation against Kim and the victim concerning guardianship of Rebecca and related visitation issues. The defendant was motivated to assist her mother because she was concerned that Kim was not providing Rebecca with proper care and attention. She also believed that the victim was abusive toward Kim and Rebecca and that Kim was powerless to protect Rebecca from harm. In addition, she was distressed by reports that the victim might leave Connecticut with Kim and Rebecca and that she and the Carpenters no longer would be able to see the child.

---

[1] See footnote 20 of this opinion.

In November, 1992, Haiman Clein hired the defendant as an associate in his law firm, Clein and Frasure. In 1993, the defendant moved out of her parents' home and into an apartment in Norwich. At the end of November, 1993, the defendant, who was thirty years old, and Clein, who was fifty-two years old, began a torrid affair. Although Clein was married and the father of four children, he once told the defendant that a book about sexual obsession entitled "Damaged" accurately summed up his feelings about their relationship.

By early December, 1993, the defendant had become so worried about Rebecca's safety that she asked Clein to kill the victim. Clein initially refused, but later told the defendant that he knew someone by the name of Mark Despres who might be willing to do the job, at which point the defendant instructed Clein to make the necessary arrangements.

When Clein subsequently met with Despres in his New London office, he explained that he was involved with a woman whose niece was being abused and that the only way to stop the abuse was to kill the abuser. After further discussion, Despres agreed to kill the victim for $8500. The defendant gave Clein the victim's purported home and work addresses, a description of the victim's car and a photograph of the victim, all of which Clein passed on to Despres so that he would be able to locate and identify the victim. Clein also gave Despres approximately $2000 toward payment of his fee.

In mid-February, 1994, Clein told Despres not to kill the victim because he was upset with the defendant and no longer wanted to help her. Although the defendant initially appeared to accept Clein's decision, she came to him three or four weeks later in a state of hysteria after hearing from her family that Rebecca had a burn mark on her back and had been locked in the cellar by

the victim. In light of these alleged events, the defendant told Clein that she wanted the victim killed and would be willing to pay for it herself.

The following day, Clein invited Despres to his New London office and asked him to proceed with the killing. Despres indicated that he would do as Clein requested for $5500, less than the agreed upon amount, but that he wanted more money that day. Clein assented and the two men went to the bank, where Clein withdrew $1000 and gave it to Despres.

In early March, 1994, Despres learned through a newspaper advertisement that the victim was selling a tow truck. Despres called the victim, representing himself as a buyer, and arranged to meet the victim. On March 10, 1994, Despres, accompanied by his fifteen year old son, Chris Despres, met the victim in the parking lot of a Howard Johnson's restaurant on Interstate 95. After a short conversation, the victim agreed to show the tow truck to Despres, who followed the victim northbound on the interstate to exit seventy-two. As they exited, Despres flashed his headlights, causing the victim to pull over and stop on the shoulder of the roadway. Despres pulled over directly behind the victim. After the two men got out of their cars, the victim approached Despres and asked what was going on. Despres responded that he was looking for a gas station. He then fired six shots at the victim. When headlights appeared from behind, Despres jumped back into his car and sped away to his home, driving over the body as he fled from the scene. Moments later, the occupants of the approaching vehicle discovered the victim's body lying on the roadway and notified the police.

Early the following morning, Cynthia Carpenter read about the incident in the newspaper and telephoned the defendant to inform her of the victim's death. The defendant immediately called Clein, who rushed to her

apartment in Norwich. When Cynthia Carpenter later called the defendant to tell her that the Connecticut state police were coming to the Carpenters' home to question them about the incident, the defendant and Clein volunteered to come as well. Only after they answered every question asked by the state police, did the defendant and Clein depart.

The defendant continued her relationship with Clein for the next eighteen months despite several unsuccessful attempts to end it. In January, 1995, she resigned from Clein's law firm to look for another position. Nine months later, she left the country to begin a new job in London.

In December, 1995, the police issued a warrant for Clein's arrest and he fled from the state. Thereafter, the defendant was contacted by Scotland Yard and cooperated with British and United States law enforcement authorities in apprehending Clein. Notwithstanding his status as a fugitive, Clein wanted to stay in touch with the defendant. Accordingly, he and the defendant arranged to call each other at designated times, using pay telephone numbers in the United States and London. The defendant then informed the authorities of the time and place of the prearranged calls. Clein was arrested in February, 1996, during one such call from the defendant to a telephone number in California. Upon his arrest, Clein's last words to the defendant were: " 'You set me up . . . .' "

Following Clein's arrest, the defendant went to Dublin, Ireland, and was accepted into a commercial law program at University College Dublin. Although she attended courses for about two weeks, she was unable to continue because she could not afford the tuition. She thus began working at a local pub to save the required funds. In November, 1997, the defendant's plans were thwarted when she was arrested in connec-

tion with the victim's murder and imprisoned in Ireland for nineteen months.

In June, 1999, the defendant waived extradition, was arraigned in New London Superior Court and was charged with capital felony, murder as an accessory and conspiracy to commit murder. After a two month trial, the jury returned a verdict of guilty on all three counts. The court merged the capital felony and murder convictions and sentenced the defendant on those two counts to a term of life imprisonment without the possibility of release. On the count of conspiracy to commit murder, the court sentenced the defendant to a term of twenty years imprisonment to be served concurrently with the preceding sentence.

On appeal from the judgment of conviction, the defendant raises numerous claims, which we address in turn.

I

The defendant first claims that the trial court committed evidentiary error and deprived her of her right to present a defense under the sixth amendment[2] to the United States constitution when it excluded the testimony of Robert Novelly, a psychologist, on the nature of codependent relationships and why women often fail to leave such relationships. This evidence was offered to rebut the state's claim that the defendant's failure

---

[2] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." The sixth amendment "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 422, 636 A.2d 821 (1994). The sixth amendment right to present a defense is made applicable to the states through the due process clause of the fourteenth amendment. See *State* v. *Colon*, 272 Conn. 106, 313, 864 A.2d 666 (2004).

to end the affair with Clein following the murder indicated her complicity in the crime. We reject the defendant's claim.

To the extent that the defendant did not preserve her claim of constitutional error at trial, she now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he first two [prongs of *Golding*] involve a determination [as to] whether the claim is reviewable; the second two . . . involve a determination [as to] whether the defendant may prevail." (Citation omitted; internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 555, 854 A.2d 1 (2004).

Although the record is adequate for review, we conclude that the defendant's claim is not of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Brown*, 199 Conn. 14, 24, 505 A.2d 690 (1986) (ruling as to proper evidentiary foundation "is not an issue of constitutional dimension, but rather of

---

[3] The defendant argues that, although defense counsel did not object on constitutional grounds when the court considered arguments for admitting the expert testimony, her claim was preserved as constitutional error because "everyone was aware of the importance of Novelly's testimony to the theory of the defense and its constitutional implications." We disagree that the arguments of counsel can be construed so broadly. Because the defendant has requested *Golding* review of the constitutional claims, we need not consider whether such review is necessary when an objection has been made at trial solely on evidentiary grounds.

the trial court's discretion" [internal quotation marks omitted]); *State* v. *Nunes*, 58 Conn. App. 296, 305, 752 A.2d 93 ("[d]ecisions on whether a proper foundation has been laid are evidentiary and, therefore, not constitutional in nature"), cert. denied, 254 Conn. 944, 762 A.2d 906 (2000). We therefore review the defendant's claim under state evidentiary law.

The following additional facts and procedural history are relevant to our resolution of this claim. At the outset of the trial, defense counsel filed a motion in limine to exclude certain evidence, including testimony that the defendant had failed to end her affair with Clein following the victim's murder. The state opposed the motion, arguing that the defendant's continuation of the affair was "important circumstantial evidence of her knowledge and intent before the crime was committed."[4] The court, however, deferred ruling on the motion until later in the proceedings.

The theory of the defense was that Clein had plotted to kill the victim without the defendant's knowledge because he loved her, was desperately afraid that she might leave him and wanted to impress her. The defendant thus testified on direct examination that she did not ask Clein to kill the victim or to hire someone else to kill the victim and that she did not know that Clein had arranged to kill the victim until the weekend following the murder. The defendant also testified on direct examination that she continued the affair following the murder because of her complete emotional dependence on Clein, despite her feelings of shame and self-disgust that she was involved with a married man. She specifically testified: "I didn't feel right when I wasn't with

_____

[4] The state argued: "[S]he didn't say 'I don't want to have anything more to do with you. I'm going to the police. You killed my brother-in-law.' She continues her affair with [Clein] and maintains her relationship. He pays for her attorney's fees. This is important circumstantial evidence of her knowledge and intent before the crime was committed."

him. . . . I needed to be with him all the time. He sort of validated me and made me feel whole. When I wasn't with him, [I] felt like there was something wrong with my life and I wouldn't be able to function, and I felt like there was this hole inside of me. I just felt like I needed to be with him all the time. It was like a driving force in my life." She further explained that, although she had tried to leave Clein many times, she could not break away: "It would last for three or four weeks at a time. I changed the locks on my house three times. I changed the phone number on my house. I changed the phone number on my cell phone." Clein, however, would "come back or he'd call, and I would answer the phone or answer the door. I couldn't say no to him and I was disgusted with myself. . . . It would make [me feel] more and more worthless the more I took him back."

On cross-examination, the defendant indicated that she had made no attempt to hide the affair from Clein's family and even flaunted it in front of his children. The defendant called Clein at his home, went to a restaurant where he was dining with his family to tell him that she had miscarried his twins, met him at a local commuter parking lot where they had a heated discussion that lasted for nearly one hour as he and his family were leaving on a weekend vacation, appeared on the doorstep of his residence where she argued with him in front of his children and followed him on a family vacation to Key West, Florida.

On re-direct examination, when defense counsel explored the defendant's inability to break off her relationship with Clein, she explained that she had gone to London in part because "I [was] disgusted with myself because I was weak, and I couldn't get away from [Clein] . . . ." She continued: "I needed to be with him. I felt like I couldn't function when I wasn't with him. . . . I wasn't a whole person when I wasn't with him. I would

sit home by the phone and wait for him to call. I would cancel dinners with my friends. I wouldn't go out. I just—it was like I couldn't function. I couldn't do anything else. I would just wait around for him and for everything to be okay." On recross-examination, the defendant admitted that she was ambivalent about assisting Scotland Yard in apprehending Clein, but that she ultimately came to believe, after the warrant had been issued, that he should be arrested for the murder.

Clein and his treating psychiatrist testified in turn as to Clein's sense of self-importance, his preoccupation with power, his habit of engaging in illegal conduct and his overwhelming passion for the defendant. Clein testified that he had established his own law firm with a substantial real estate practice and that the firm had offices in Old Saybrook and New London. He also admitted that, although he had achieved professional independence and apparent success, he had engaged in a wide range of illegal conduct, including stealing substantial sums of money from his clients, lying to them about the status of their cases, forging their names on checks and legal documents and misusing their credit cards.

Clein's unlawful behavior extended to his personal life. He was a heavy drug user who liked to mix cocaine with alcohol and prescription drugs such as Prozac, Xanax and Nortriptyline on a daily basis. His psychiatrist, Vittorio Ferrero, diagnosed him with antisocial personality disorder characterized by a "pervasive . . . disregard for and violation of the rights of others . . . ." Ferrero based his diagnosis on evidence that Clein did not conform to social norms with respect to lawful behaviors and that he was deceitful, impulsive, irresponsible and lacking in remorse after hurting or mistreating others. Clein himself was able to perceive deficiencies only in his professional life. To remedy one such deficiency, his inability to maintain his practice

without financial losses, he attempted to gain favor with and obtain financial support from potential business partners by throwing wild parties at his home in which the participants indulged in couple swapping and other sexual escapades. Clein also testified that his obsession with the defendant had persisted over a long period of time. He admitted that he was enthralled with her, wanted to impress her and wrote her passionate letters declaring that he would do anything for her.

The defense offered the testimony of Novelly near the end of the trial to rebut the state's attempt to impeach the defendant's credibility during cross-examination by eliciting testimony that she had continued her affair with Clein and had failed to report him to the police despite her knowledge of his role in the murder. Defense counsel stated that Novelly would testify generally about codependency and would describe how an individual can become so dependent on a pathological relationship for a variety of psychiatric or psychological reasons that the individual cannot end the relationship, even though they know it is unhealthy. The state responded that it was not familiar with codependency "syndrome," that the purported syndrome was not recognized under Connecticut law, and that the state did not have adequate notice to prepare for Novelly's testimony.

During the defendant's offer of proof, Novelly explained that although most people believe that they know what a relationship is because they are involved in one, relationships between a man and a woman differ greatly in quality, ranging from healthy to painful, and are distributed along a bell curve. Ninety-five percent of all such relationships occupy the middle of the bell curve and are considered normal. The remaining 5 percent can be found in equal numbers at the tail ends of the bell curve. At one end are extremely healthy relationships in which each person remains fascinated

with the other and continues to grow, even after many years of marriage. At the other end are codependent relationships, in which the personalities of the partners encompass a variety of abnormal or pathological needs that are so interdependent that they are "like a hand fitting into a glove . . . ."[5] As a result, attempts by one of the partners to end the relationship are often doomed to failure.[6] Novelly further testified that codependent

[5] Novelly explained: "For example, if . . . the male was very narcissistic, self-centered, preoccupied with his own power, preoccupied with his own vanity, his own sense that the rules don't apply to him . . . it's a narcissistic personality, and when you team it up with other traits, you get the kind of individual I described who needs someone to keep reaffirming how great they are, how omnipotent they are, how all of their egocentric selfishness is reaffirmed.

"It's got to be reaffirmed by someone. It's reaffirmed in this pathological relationship. That type of person will typically . . . watch for females who have huge dependency [needs], their self-esteem might be fragile. They are so needy emotionally that their well of need can almost never be filled. The fear of abandonment is substantial. It's huge. And therefore what the narcissistic person . . . looks for is the person who they can control, who'll fawn over them, who will affirm to them their own omnipotence. And in that relationship, what the dependent person gets in return is having all of their dependency needs met. They get reaffirmed that they are important, that they have a sense of self-worth that they didn't have outside of that relationship.

"And because of the power of that mutual pathological dependency, the person who is particularly the dependent person as, for example, in . . . battered woman['s] syndrome, it's a parallel example, knows that what is going on is wrong. In their head, they may know what's going on is wrong, but the emotional drive necessary, the need, the fear of abandonment is so intense that the person keeps trying to minimize, deny or put off the realities of how destructive the person is or the relationship is to them. And so they keep staying in their relationship and staying in it even though they know, for example, that they've had broken legs or they've been beaten . . . [as in] the battered woman['s] syndrome model of codependency, so reality doesn't easily influence the person's behavior, common sense doesn't easily influence the person's behavior, because in the end it comes down to emotional need. And that emotional need compromises judgment, reasoning, and logic, so it's often very tough to get a person out of a codependent relationship, even though it's very destructive to them."

[6] Novelly testified: "[T]here are episodic outbreaks of anger, resentment at the individual who they're in this codependent relationship with, but as soon as the anger and resentment episodes occur, then comes the guilt, the fear of abandonment, the atonement and compliance, again, back into the relationship so everything gets sealed up and gets [back to] the status quo

relationships are formed in a variety of contexts and can be found among drug and alcohol abusers, batterers and narcissistic sociopaths, who typically engage in the mental and emotional manipulation of dependent females.

Novelly then testified that the concept of codependent relationships had existed for at least fifteen years and that he had treated more than two dozen individuals and six couples for the disorder during his twenty-five years of practice. He explained that the methodology used to make a clinical finding that two individuals are in a codependent relationship includes taking individual histories, taking the history of the couple and examining, in-depth, each of their personalities. This examination normally includes a series of psychological tests consisting of 400 to 1000 questions. He also explained that once it has been established that an individual has the requisite personality type, "you can say more likely than not, on average, given such and such circumstance in a relationship, the person will likely behave [in a certain] way . . . ." Accordingly, diagnostic evidence of an individual's personality type may have some predictive value.

----

. . . . There are episodes, though, in which the woman in particular will go talk to someone, talk to a doctor, talk to a psychologist. . . . For a short time they seem to have a grip. Indeed, they always have a grip in terms of how bad the reality is, but again the emotions keep pushing them back into that relationship because their own needs are so extreme as they are in the . . . narcissistic, manipulative individual as well, but because they fit like hand and glove . . . each one mutually giving to the other what they need in a pathological way, it supports the abnormalities in each personality and the relationship continues. . . .

"These codependent relationships usually evolve out of various types of personality anomalies or disorder. The whole person is not, for example, disordered. They may be quite functional in many areas of their life. But usually that one area that is so extremely underdeveloped, usually by current research, you can trace it back to at least adolescence and usually [to] the relationships in the family of the individual growing up, that that one area of pathology fits within the other area of pathology in the other individual, and . . . they mutually support each other unwittingly."

Thereafter, the court engaged in a lengthy discussion with counsel as to the relevance of Novelly's testimony in the absence of diagnostic evidence that the defendant and Clein had codependent personalities. The state argued that there was nothing in the record to indicate that the relationship was codependent. The court echoed this observation when it stated that there had been no testimony that either Clein or the defendant had a codependent personality type likely to form a codependent relationship. The court took special note of the fact that Clein's psychiatrist had not testified that Clein was narcissistic and asked counsel how the jury would know where on the bell curve the relationship fell. The court went on to distinguish codependent relationships from battered woman's syndrome by noting that the act of battering gives rise to battered woman's syndrome, whereas the unique personality traits of the partners form the basis for codependent relationships. The court stated that it seemed only logical that before the jury could apply Novelly's testimony in the present case, evidence would be required to establish that Clein and the defendant had codependent personalities. Nevertheless, the court did not question the scientific validity of codependent relationships as a recognizable pattern of conduct or Novelly's qualifications to testify as an expert. The court, instead, observed that although there had been testimony regarding the conduct of Clein and the defendant, there had been no testimony that, to a reasonable degree of scientific probability, Clein and the defendant had personality types that would give rise to such a relationship.

Defense counsel insisted that the record contained sufficient evidence to support the admission of expert testimony on codependent relationships.[7] With the

---

[7] To support the conclusion that Clein was an egomaniac or narcissistic, defense counsel pointed to testimony by Clein and his treating psychiatrist that Clein "was taking a substantial amount of illegal drugs; he was stealing apparently over a million dollars from at least one client and hundreds of thousands from others . . . [and medical testimony indicated] that his men-

court's permission, defense counsel asked Novelly to answer a hypothetical question regarding codependent personalities, formulated on the basis of the record developed at trial.[8] In response to the question, Novelly stated that he felt comfortable testifying that the behavior described in the hypothetical would be *consistent* with the behavior of someone with a "dependent per-

tal disorder made him think he was Superman, capable of doing anything for anybody." Defense counsel also pointed to evidence in the record that the defendant feared abandonment, that she had thrown scenes and argued with Clein in front of his family, that she felt validated when Clein was present and had waited at home for him to call as examples of behavior indicative of a codependent relationship.

[8] The defense posed the following hypothetical question to Novelly: "[I]s there a reasonable probability that the following behavior exhibited by a woman in a relationship with a man establishes a pattern of behavior consistent with an unhealthy, dependent personality type. Assume . . . that there is a [twenty-eight] year old woman who is a neophyte lawyer on her first real job, that she becomes involved with a man [twenty-two] years her senior, who himself is married to his fourth wife, is the senior partner in the law firm for which she is employed; that he is a cocaine abuser; that he also abuses alcohol and prescription drugs; that he has stolen over a million dollars from his clients; that he is a senior partner of a law firm that has multiple law offices—two to be exact—during the time period she worked for him; that [he] himself has been diagnosed with antisocial personality disorder; that they are engaged in an intensely sexual relationship; that the woman on two or three occasions has initiated and engaged in arguments with the man at his home; that she calls him numerous times in one day on occasion; that she has tried to get out of the relationship periodically during an [eighteen] month period by doing . . . things such as changing the locks on her apartment [on] three different occasions, by breaking up with him episodically and also changed her telephone numbers; that she has expressed feelings that she does not feel whole without the man; that she has expressed the feeling that she felt worthless without this person; that she expressed the feeling that she felt a need to be validated with this person; that she felt a need to resolve conflict or arguments with this man immediately; that she would alter her schedule for him, for instance, by waiting around for telephone calls from him and break plans with friends for him and that she tried unsuccessfully for [eighteen] months after she realized it was an unhealthy relationship and that she should get out of it before leaving him.

"Is . . . that pattern of conduct consistent with a dependent personality type? Is there a reasonable probability that that conduct is consistent with a dependent personality type . . . ?"

sonality sufficient to trigger" a codependent relationship. Novelly acknowledged, however, that in the absence of a detailed history and psychological testing, he could not make a "diagnosis" that the defendant and Clein had a codependent relationship because a diagnosis would involve a finding that is "beyond reasonable probability."

Prior to this testimony, the court's comments to counsel indicated that it viewed the hypothetical question as a way of obtaining evidence, missing to that point, that the defendant and Clein had codependent personalities. After Novelly answered the question, however, the court stated that Novelly's response did not constitute the evidence it was seeking because his finding that the defendant's behavior was merely consistent with that of someone in a codependent relationship was akin to "looking [at the relationship] from the other end of the bottle" or, in other words, approaching the issue from the wrong direction.

The court ultimately excluded Novelly's testimony on the ground that expert testimony on codependent relationships may not be admitted without prior evidence that the individuals involved have codependent personalities and that such evidence was lacking in the present case. The court declared: "I don't find this evidence [of codependent relationships] to meet the necessary threshold. . . . I don't find that it's relevant and [it] will not assist the jury in this case and will mislead and confuse the jury on the present state of record. So I'm not going to allow it." Accordingly, defense counsel urged the jurors during closing argument to draw on their own common sense and life experience to conclude that the defendant could not make a rational decision to leave Clein, even though she may have wanted to do so, because of the physical and emotional intensity of their relationship.

The defendant claims on appeal that, although there was no diagnostic evidence in the record that she and Clein had codependent personalities, the record contained other relevant evidence from which the jurors could have concluded that Novelly's testimony regarding codependent relationships fit the defendant's relationship with Clein. She therefore argues that the trial court abused its discretion in excluding the proffered testimony. We disagree.

We first set forth the standard that governs our review. "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 264, 856 A.2d 917 (2004).

Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Consequently, expert testimony is admissible when: "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Perkins*, supra, 271 Conn. 264.

Of course, a predicate to the admissibility of expert testimony is its relevance to some issue in the case. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common

course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter."[9] (Internal quotation marks omitted.) *State* v. *Saunders*, 267 Conn. 363, 383, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

Issues relating to the evidentiary foundation necessary to establish the relevance of expert testimony on syndrome behavior have been raised infrequently in Connecticut and, to our knowledge, only in the context of battered woman's syndrome. In *State* v. *Yusuf*, 70 Conn. App. 594, 612, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002), the defendant claimed on appeal that the testimony of the state's expert witness was " 'minimally' " relevant because the state had presented no evidence that the victim was a battered woman. The Appellate Court disagreed, concluding that the record contained evidence that the defendant had battered the victim on a number of occasions during the course of their relationship and, accordingly, that an adequate foundation had been laid to admit the expert testimony. Id., 617–18. Similarly, in *State* v. *Niemeyer*, 55 Conn. App. 447, 452–53, 740 A.2d 416 (1999), rev'd in part on other grounds, 258 Conn. 510, 782 A.2d 658 (2001), evidence of one cycle of abuse, rather than two, was deemed sufficient to qualify as battering for the

---

[9] Whether the proffered evidence will assist the trier of fact also requires a determination that "the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid . . . . In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is *both* reliable and relevant." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Porter*, 241 Conn. 57, 64, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

purpose of admitting expert testimony on battered woman's syndrome.

Other jurisdictions also have examined the record closely when determining the relevance of expert testimony on syndrome behavior. In *United States* v. *Kozminski*, 821 F.2d 1186, 1193–95 (6th Cir. 1987), the Sixth Circuit Court of Appeals concluded that the United States District Court for the Eastern District of Michigan had improperly admitted expert testimony concerning " 'captivity syndrome' " to show that two mentally retarded farmworkers had been " 'brainwashed' " into serving the defendants. Specifically, the expert testified that the psychological pressures exerted upon the workers had resulted in their " 'involuntary conversion' to complete dependency akin to 'captivity syndrome,' a psychological phenomenon arising from prolonged physical captivity." Id., 1194.

On appeal, the Sixth Circuit reversed the judgment of the District Court on the ground that an adequate foundation had not been laid to establish that the purported theory of " 'involuntary conversion' " was "in conformity [with] a generally accepted explanatory theory" under the applicable Federal Rules of Evidence. Id. The court noted that the expert had attempted to establish the scientific validity of the theory by showing that it incorporated elements of " 'captivity syndrome,' " a psychological condition generally accepted within the scientific community. Id. The court nevertheless observed that none of the ten elements that define " 'captivity syndrome,' " including prolonged captivity, were present in *Kozminski*. Id. The court therefore concluded that there was an insufficient foundation for the expert's testimony and that " 'captivity syndrome' " was inapplicable as a matter of law given the facts in the record. Id.

In the present case, the trial court did not question the scientific validity of codependency as a theory to

explain a recognizable pattern of conduct,[10] whereas the court questioned the scientific validity of "involuntary conversion" in *Kozminski*. The two cases are similar, however, because just as the Sixth Circuit found that the record did not contain evidence that the farmworkers had been subjected to conditions that would lead to "captivity syndrome," the trial court in the present case concluded that the record did not contain evidence that Clein and the defendant had codependent personalities that could lead to a codependent relationship. According to Novelly, this evidence would have consisted of facts tending to show that one partner in the relationship, presumably Clein, was "narcissistic, self-centered, preoccupied with his own power," manipulative and in need of constant reaffirmation by a person under his control with "huge dependency [needs] . . . ." Corresponding evidence also would have been required to show that the other partner in the relationship, presumably the defendant, was dependent, emotionally needy, fearful of abandonment and lacking in self-esteem outside of the relationship.

Mindful of the well established principle that "we will indulge in every reasonable presumption in favor of the trial court's ruling"; (internal quotation marks

[10] This court therefore does not decide the question of whether the concept of codependency is scientifically valid under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), as adopted by this court in *State* v. *Porter*, 241 Conn. 57, 68, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), or whether Novelly's testimony was admissible under the approach followed in *State* v. *Spigarolo*, 210 Conn. 359, 376–80, 556 A.2d 112 (undertaking review of practices in other jurisdictions before concluding that expert testimony on behavioral characteristics of abused children is admissible in Connecticut), cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), and *State* v. *Borrelli*, 227 Conn. 153, 164–65, 629 A.2d 1105 (1993) (citing *Spigarolo* in admitting expert testimony on battered woman's syndrome and rejecting analytical test in *Frye* v. *United States*, 293 F. 1013 [D.C. Cir. 1923], which preceded standard for determining scientific validity articulated in *Porter*).

omitted) *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995); we conclude that the court did not abuse its discretion in excluding Novelly's testimony on the ground that there was no diagnostic evidence that the defendant and Clein had personality types that made it likely that they would form a codependent relationship.

We recognize that experts have been permitted to testify without examining the victim regarding the psychological underpinnings of battered woman's syndrome. See *State* v. *Borrelli*, 227 Conn. 153, 164, 168–69, 629 A.2d 1105 (1993) (court permitted expert witness to testify regarding reasons why battered women remain in destructive relationships without examination of victim);[11] see also Conn. Code Evid. § 7-4 (b), commentary (expert testimony may be predicated on facts made known to expert at trial or presented in form of hypothetical). Codependent relationships, however, are fundamentally different because the defining element in relationships involving battered women is the physical violence inflicted upon the victim, whereas the defining element in a codependent relationship is the psychological make-up of the partners that binds them together. Physical violence is a familiar concept that is within the realm of ordinary human experience and understanding and consists of easily recognizable conduct with an obvious and immediate effect, namely, bodily harm to the victim. Although this court never

[11] In *Isaacs* v. *State*, 659 N.E.2d 1036, 1040–41 (Ind. 1995), the only case, to our knowledge, that has considered this issue directly, the defendant claimed that the trial court improperly had permitted the state to introduce the testimony of a psychiatrist on battered woman's syndrome to refute the defendant's argument that he and his wife had a friendly relationship prior to her death. The defense contended that the foundation for admitting his testimony was inadequate because the psychiatrist had not examined or interviewed the defendant or his wife. Id. The Indiana Supreme Court concluded, however, that the testimony was relevant to an understanding of the relationship between the defendant and his wife prior to her death and that the trial court did not abuse its discretion by admitting the testimony in the absence of an examination or interview. Id., 1041.

has been asked to consider whether expert testimony regarding battered woman's syndrome should be admitted in the absence of a psychological examination of the victim,[12] courts routinely have admitted this type of testimony without such an examination; see *State* v. *Borrelli*, supra, 168–69; presumably because the battering is an obvious fact that requires no further expla-

[12] We have addressed the issue tangentially only in the context of the potential for such testimony to interfere with the jury's role of determining the victim's credibility as a witness. In that regard, we have stated repeatedly that "there is a critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." (Internal quotation marks omitted.) *State* v. *Borrelli*, supra, 227 Conn. 173; *State* v. *Vega*, 259 Conn. 374, 395, 788 A.2d 1221 (2001), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001); *State* v. *Freeney*, 228 Conn. 582, 592, 637 A.2d 1088 (1994); *State* v. *Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Our case law thus suggests that one of the dangers in admitting expert testimony regarding the personality characteristics of a particular witness to explain inconsistencies in their behavior is that diagnostic testimony may be viewed as opinion testimony regarding the credibility of the witness. See *State* v. *Borrelli*, supra, 172–73; see also *State* v. *Freeney*, supra, 592.

In *State* v. *Borrelli*, supra, 227 Conn. 173 n.16, we recognized, but did not address, the issue of whether an expert should be permitted to testify that a particular witness has a personality consistent with battered woman's syndrome behavior. In *Borrelli*, the defendant claimed that the testimony of the state's expert was, in effect, opinion testimony regarding the credibility of the witness and that it should have been excluded because it improperly invaded the province of the jury. Id., 172. We rejected the defendant's claim, noting that the expert "did not testify . . . that the victim was *in fact* battered and therefore did not comment, directly or indirectly, on her credibility." (Emphasis added.) Id., 173. We emphasized that the purpose of the expert testimony was "to present to the jury possible explanations for why a victim of abuse would completely recant her accusations, explanations that in all likelihood were beyond the jury's experience and knowledge." Id., 174. We cautioned, however, that our observation that the expert had not testified that the victim was *in fact* a battered woman did not imply that such testimony would have implicitly commented on her credibility, and stated that we were not required to address the issue of whether an expert witness may offer an opinion as to whether a spouse has been battered or whether such an opinion would implicitly comment on the credibility of the witness. Id., 173 n.16.

nation. Accordingly, once evidence has been introduced that the victim has been battered and has behaved inconsistently, courts have found an " 'open and visible connection' " between the facts in the record and the testimony of the expert. *State* v. *Saunders*, supra, 267 Conn. 383.

In contrast, evidence of the psychological characteristics that define codependent personalities, such as extreme dependency and lack of self-esteem, on the one hand, and narcissistic and manipulative behavior, on the other, may not always be expressed in distinctive or pathological conduct that readily is observed. Codependent relationships have certain characteristics in common with normal relationships, in which two people fall intensely in love and depend upon each other for emotional support, sometimes to an extreme degree. As Novelly testified, the spectrum of relationships between a man and a woman ranges from extremely healthy to pathological and can be represented by a bell curve in which 95 percent of all relationships are considered normal. In the absence of diagnostic evidence or expert testimony establishing that the partners have the requisite personality traits that place them at the tail end of the bell curve, it may be impossible for the average juror to distinguish codependent relationships from relationships that are painful or difficult but are not pathological. As a result, expert testimony on codependent relationships, when there is no predicate evidence that the partners in a relationship have codependent personality types, is bound to confuse and mislead the jurors because it presumes facts not in evidence and thus improperly encourages the belief that the partners have a codependent relationship. See *State* v. *Perkins*, supra, 271 Conn. 264 (expert testimony admitted when " 'helpful' " to court in considering issues). We therefore conclude that before an expert may testify as to the common effects of a codependent

relationship on the behavior of the partners, diagnostic evidence or expert testimony[13] must be introduced to establish that the partners have personality types conducive to the formation of a codependent relationship.[14]

[13] Expert testimony that the partners have personality types conducive to the formation of a codependent relationship may be based on several sources of information. An expert may have personal knowledge of the underlying facts or may obtain the requisite information by attending the trial and hearing the factual testimony. C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.9.1, p. 532; see also Conn. Code Evid. § 7-4 (b). If an expert has heard all of the relevant testimony, it is also within the court's discretion to permit a question predicated on that testimony. C. Tait, supra, § 7.9.1, p. 532. Finally, an expert may obtain information at trial by having factual testimony summarized in the form of a hypothetical question at trial. Id.; Conn. Code Evid. § 7-4 (c).

In this case, defense counsel asked a hypothetical question; see footnote 8 of this opinion; in which he sought Novelly's opinion as to whether the defendant's conduct, as described in the hypothetical, was consistent with "an unhealthy, dependent personality type." Novelly's response to the hypothetical question, therefore, unlike that of other experts who have testified on syndrome behavior; see *State* v. *Freeney*, 228 Conn. 582, 590–91, 637 A.2d 1088 (1994) (trial court permitted expert testimony in response to hypothetical question as to whether conduct of victim was consistent with that of other sexual assault victims with whom expert had worked); *State* v. *Christiano*, 228 Conn. 456, 460–61, 637 A.2d 382 (trial court permitted expert testimony in response to hypothetical questions as to whether victim's prolonged delay in reporting sexual abuse by foster father was consistent with conduct of hypothetical victims of sexual abuse in similar situations), cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994); was intended to provide a *foundation* for proposed testimony about the general nature of codependent relationships and why individuals who are in such relationships find them difficult to end by establishing that the defendant and Clein had codependent personality types. The trial court, however, determined that it was not enough for Novelly to conclude that the defendant's conduct was merely *consistent* with that of someone with the type of personality that might lead to the formation of a codependent relationship. Instead, the court sought evidence that there was, in fact, "a reasonable medical probability" that the defendant and Clein had such personalities, which Novelly was unable to provide. The trial court thus determined that, in the absence of evidence that the defendant and Clein had the personality types likely to form a codependent relationship, Novelly's testimony on codependent relationships would have been akin to expert testimony that a victim's behavior was consistent with battered woman's syndrome in the absence of evidence that she had been battered.

[14] Because we have determined that there was insufficient evidence of the requisite personality types, we need not consider whether expert or

In the present case, although Clein's treating psychiatrist testified that he was egocentric and manipulative, he did not testify that Clein had the type of personality likely to form a codependent relationship. Moreover, no expert testimony or diagnostic evidence was introduced to establish that the defendant had such a personality. Accordingly, we conclude that the record contained insufficient evidence to provide the necessary foundation for Novelly's testimony and that the trial court did not abuse its discretion by excluding it.

The defendant further contends that Novelly should have been permitted to testify because experts often respond to hypothetical questions to show that the conduct of the witness or party is consistent with an explanation that the jurors might not have considered. We are not persuaded.

Section 7-4 (a) of the Connecticut Code of Evidence provides: "An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion." As discussed, the defendant's claim fails because expert testimony in response to a hypothetical question regarding the defendant's conduct would have lacked relevance in the absence of an adequate foundation. Moreover, the hypothetical question presented to Novelly was designed to elicit an opinion regarding the defendant's personality traits rather than her conduct. See footnote 13 of this opinion. The defendant's claim therefore lacks merit.

II

The defendant's second claim is that the trial court committed evidentiary error and deprived her of her right to confront the witnesses against her under the

diagnostic testimony also is required to show that the partners, in fact, have a codependent relationship prior to admission of expert testimony on codependency.

sixth amendment[15] to the United States constitution when it admitted irrelevant hearsay evidence regarding her purported motive to kill the victim. This evidence consisted of: (1) Cynthia Carpenter's affidavit, dated October 20, 1992, in support of her request for an ex parte order of temporary custody in which she referred to past conversations with the victim and Kim and described Kim's failings as a parent; (2) Cynthia Carpenter's written account of a telephone conversation with the victim on March 16, 1993, in which she argued with the victim about her relationship with Kim and Rebecca; (3) several court-ordered investigative reports prepared for the Probate Court by the department of children and families (department) in November, 1992, and February, 1993, containing statements by Kim, the victim, the Carpenters and the victim's parents, Daloyd "Dee" Clinton and Anson Clinton, Jr., regarding the personal histories of Kim and the victim and Kim's alleged abandonment of Rebecca; and (4) Dee Clinton's testimony that the victim, beginning in July, 1993, until the time he was murdered, was contemplating a move to Arizona with Kim and Rebecca. The defendant argues that the state intended to show by means of this evidence that the Carpenters harbored animosity toward Kim and the victim and that the defendant came to share this animosity because she often talked with her parents about Rebecca's situation. We disagree with the defendant that admission of the disputed documents and testimony violated her sixth amendment right to confront her accusers or that it resulted in harmful error under state evidentiary law.

---

[15] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

Although the defendant objected to admission of the evidence as irrelevant and inadmissible hearsay, she did not take exception on constitutional grounds. She therefore seeks review of her constitutional claim under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the defendant's constitutional claim must fail and that, to the extent that the trial court's rulings were improper under state evidentiary law, the rulings were harmless.

The standard for review of evidentiary rulings is well established. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion.".(Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 542, 864 A.2d 847 (2005).

With respect to the principles that govern application of the hearsay rule in criminal cases, "[a]n out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule. . . . A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that the proponent's use of the statement is reasonably necessary and the statement itself is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Citations omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 812, 865 A.2d 1135 (2005).

"Beyond these general evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment." (Internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 361, 844 A.2d 191 (2004). "The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings. *Pointer* v. *Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). . . . [T]he primary interest secured by confrontation is the right of cross-examination. *Davis* v. *Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)." (Citation omitted; internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 798, 847 A.2d 921 (2004).

"In defining the specific limits of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. . . . At the same time, [a]lthough . . . hearsay rules and the [c]onfrontation [c]lause are generally designed to protect similar values, [the court has] also been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. . . .

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). . . . [H]owever, the United States Supreme Court [subsequently] overruled *Roberts* to the extent

that it applied to testimonial hearsay statements. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the court concluded that the reliability standard set forth in the second prong of the *Roberts* test is too amorphous to prevent adequately the improper admission of core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude. . . . The court held, therefore, that such *testimonial* hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant had a prior opportunity to cross-examine the declarant. . . .

"In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether. . . . In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant.

"Although the court declined to define the terms testimonial and nontestimonial, it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials,

such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that [t]hese formulations all share a common nucleus and then define the [c]lause's coverage at various levels of abstraction around it." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 361–64.

With these principles in mind, we turn to an examination of each of the defendant's hearsay claims, with additional facts set forth as necessary.

A

We begin our analysis with Cynthia Carpenter's affidavit in support of her application for immediate temporary custody of Rebecca. In her affidavit, she described Kim's failings as a parent, made many critical comments about Kim and the victim and referred to out-of-court statements by Kim, the victim and the victim's sister that portrayed Kim and the victim in an extremely negative light. The prosecutor initially offered the exhibit during direct examination of Rebecca's court-appointed guardian ad litem, Linda Kidder, to show the basis for Kidder's recommendation that temporary custody of Rebecca be awarded to Cynthia Carpenter. The exhibit also was intended to show the Carpenter family's state of mind and the effect of the affidavit on Kidder, Dee Clinton and department officials working on Rebecca's case. Defense counsel objected, arguing that the document contained inadmissible hearsay. Counsel also noted that, even if the information contained in the affidavit portrayed the relationship between the victim and the Carpenters as acrimonious, that relationship

was not relevant to prove animosity between the victim and the defendant, who was mentioned in the affidavit tangentially only one or two times. After hearing arguments outside the presence of the jury, the court admitted the application for immediate temporary custody but sustained defense counsel's objection to admission of the affidavit on hearsay grounds. The court left open the possibility, however, that it might admit the document later in the proceedings following further testimony.

Thereafter, defense counsel cross-examined Kidder as to her reasons for recommending that temporary custody of Rebecca be awarded to Cynthia Carpenter, her failure to document the reasons for her recommendation by means of notes or a written report and the significance of her recommendation in light of the statutory presumption that it is preferable for children to remain with their natural parents. On redirect examination, when Kidder testified that she had relied on the affidavit when making her recommendation to the Probate Court, the prosecutor again offered the document into evidence. Defense counsel repeated his objection on hearsay grounds and on the ground that the state had not established an adequate foundation because the document had no apparent connection to the defendant.

The court permitted the state to introduce the affidavit into evidence to explain the basis for Kidder's recommendation because defense counsel had emphasized during his cross-examination of Kidder the severity of removing a child from the custody of its natural parent and the predisposition of the law against such a step. The court specifically concluded: "[T]his document, whatever its truth or lack of truth, was the basis on which this witness made a recommendation. That was highlighted in cross-examination as being unusual. And so, on that basis, I think it's fair for the jury to understand the information that she had in formulating the

recommendation that she made." The court also granted defense counsel's request for a cautionary instruction to the jury that the document be considered for a limited purpose and that Cynthia Carpenter, rather than the defendant, had signed it.[16] In its final instructions, the court also advised the jury: "Some testimony and exhibits have been received for a limited purpose; where I have given a limiting instruction, you must follow that."

The defendant claims that the trial court violated her constitutional right to confront her accusers by admitting Cynthia Carpenter's affidavit. She argues that the affidavit was clearly testimonial within the meaning of *Crawford* because it was ex parte in-court testimony or its functional equivalent. She further argues that, even if the affidavit was admissible under *Crawford*, it was not admissible under *Roberts* because it lacked adequate indicia of reliability. She finally argues that the affidavit was inadmissible under state evidentiary law. We disagree.

With respect to the defendant's constitutional claim, we conclude that the record is adequate for review, but that the claim must fail under the second prong of *Golding* because it is not of constitutional magnitude

---

[16] The court instructed: "Ladies and gentlemen, I'm going to allow in a piece of evidence. But as I allow it in, I want to give you a limiting instruction concerning this evidence. Most evidence that comes into a trial you can use for all purposes, there's no restriction. Some pieces of evidence come in for a very limited purpose, and you should only use it for that limited purpose. I'm allowing into evidence a portion of the application for this temporary custody . . . which is an affidavit that was signed by Cynthia Carpenter, not the defendant, Beth Ann Carpenter, but Cynthia Carpenter. I'm allowing this affidavit into evidence for a limited purpose, that is as one of the three bases that Attorney Kidder has testified to that she used in formulating the recommendation that she made to the Probate Court. She has given evidence on . . . what she used or what [were] sort of the building blocks that she used for her [recommendation]. This was one of them. But it's not for the truth of the affidavit, it's for the reasons that she made the decision to make the recommendations as she did and for no other purpose."

alleging the violation of a fundamental right. See *State v. Golding*, supra, 213 Conn. 239–40. Both *Crawford* and *Roberts* enunciate principles that govern the admission of out-of-court statements for the truth of the matter asserted. See *Crawford v. Washington*, supra, 541 U.S. 51–53; *Ohio v. Roberts*, supra, 448 U.S. 62–63. In the present case, the trial court permitted the state to introduce the affidavit not for its truth, but to assist the jury in understanding the reasons for Kidder's recommendations to the Probate Court. Defense counsel recognized this purpose when he specifically requested, and the trial court subsequently gave, a limiting instruction to the jury to that effect. We therefore conclude that the defendant's constitutional claim must fail because the admission of out-of-court statements for purposes other than their truth raises no confrontation clause issues. See *Crawford v. Washington*, supra, 59–60 n.9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985). We also conclude that the trial court did not abuse its discretion under state evidentiary law because it admitted the affidavit for nonhearsay purposes.

The defendant argues that, even if the affidavit was not inadmissible hearsay, it was not relevant and should not have been admitted into evidence to show the basis for Kidder's recommendation because neither the Probate Court's decision nor Kidder's state of mind were significant issues at trial. The defendant contends that Kidder did not make the ultimate custody determination and that the affidavit was only one of several sources of information that influenced her recommendation. Furthermore, the information in the document was highly prejudicial to the defendant. The state replies that the affidavit was admitted properly to rehabilitate Kidder after the defendant cross-examined her about the unusual nature of her recommendation to remove

custody of Rebecca from Kim, even on a temporary basis. We agree with the state.

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . .

"In determining whether otherwise inadmissible evidence should be admitted to rebut evidence offered by an opposing party, the trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence . . . . Accordingly, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. . . . We will not overturn the trial court's decision unless the trial court has abused its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Paulino*, 223 Conn. 461, 467–68, 613 A.2d 720 (1992).

Although the defendant now diminishes the importance of Kidder's recommendation, the defense directed much of its cross-examination to Kidder's failure to make notes or to produce a written report during the

course of her investigation. By attempting to cast doubt on Kidder's credibility by suggesting that she had not followed proper procedures or undertaken a thorough examination of Rebecca's situation, the defense opened the door to rebuttal by the state. The only significant documentary evidence available to indicate why Kidder and the Probate Court had reached their respective conclusions was Cynthia Carpenter's affidavit, in which she described Kim's deficiencies as a parent and Kim's relationship with the victim. Although Kidder's recommendation was not a major issue at trial, it contributed to an understanding of the probate litigation initiated by the defendant and Cynthia Carpenter, which was largely based on their negative perceptions of the victim, his control over Kim and Kim's demonstrated lack of responsibility for and interest in Rebecca. Accordingly, the state properly was concerned about rehabilitating Kidder following her cross-examination by the defense. Moreover, although the defendant was barely mentioned in the affidavit, any possible harm that she might have suffered from its admission was mitigated by the court's limiting instruction, which advised the jury not to consider the affidavit for its truth, but as one of the bases that informed Kidder's recommendations to the Probate Court. The court's final instructions also reminded the jury to follow any cautionary instructions previously given when testimony and exhibits had been admitted for a limited purpose. We therefore conclude that the trial court did not abuse its discretion in admitting the affidavit into evidence and that the defendant's claim must fail.

B

We next consider Cynthia Carpenter's written account of her telephone conversation with the victim on March 16, 1993, one year prior to the murder, wherein he allegedly denied her access to Kim and

assailed her with accusations and insults.[17] Cynthia Carpenter had created the document following the call and had given it to her attorney for use in the Carpenters' visitation action. At the defendant's trial, the prosecutor offered the document during his direct examination of Tricia Gaul, the wife of Rebecca's natural father, John Gaul. Kim had a brief affair with John Gaul during her first marriage and the defendant had encouraged him to seek visitation rights and partial custody of his daughter so that the Carpenters could work through him to obtain increased visitation for themselves. When the Gauls appeared willing to cooperate with the Carpenters and were receptive to initiating a visitation action of their own,[18] the defendant referred them to an attor-

---

[17] In her account of the telephone conversation, Cynthia Carpenter wrote as follows: "[The victim] called—I asked if I might speak with Kim. He stated that I was not allowed to speak with her as I upset her. I stated that she never indicated to me that she was upset by anything I said.

"I asked what happened Wednesday night regarding our meeting at McDonald's when they had agreed we might visit with Rebecca. He stated that the visit was supposed to be a meeting with Kim and him, which it was not. He arrived with a tape recorder stating the above.

"At this point he became insulting:

"—I can't be a grandmother if I don't know how to be a mother.

"—Getting a restraining order to prevent me from speaking to Kim on the phone and from going into Stop & Shop and 'harassing' Kim.

"—If we are on Stagecoach Road he will force [me] off the road with his tow truck.

"—He is Rebecca's 'father' and he will tell us what the rules are.

"—If we give him any problems he will disappear with Kim and Rebecca.

"—He is adopting Rebecca shortly.

"—The 'psychologist' states that we are the ones who are causing Rebecca problems.

"[The victim] calls claiming he would like to put a resolution to our problems. However, each time he immediately begins by denying [me] access to my daughter and hurling insults. The conversation ended with [the victim] stating he was Rebecca's father and he controlled the situation. If we ever want to see Kim or Rebecca again we need to cooperate with him or he would disappear with both of them."

[18] To assist the Gauls in their litigation, Richard Carpenter gave John Gaul a job with his landscaping company and the defendant gave Tricia Gaul a bank check to pay for legal assistance, telling her that the money should not be traced to the defendant because it would be a conflict of interest for the defendant to pay for John Gaul's attorney.

ney and gave Tricia Gaul a file containing Cynthia Carpenter's written account of the telephone conversation and several other documents to assist them in their litigation.

After Tricia Gaul testified that the defendant had given her a file containing these documents, the prosecutor queried her about the victim's conflicted relationship with the defendant and Cynthia Carpenter. The prosecutor then asked if she remembered seeing the documents in the file, but, before he could show them to the witness to refresh her memory, defense counsel objected on the ground that the documents constituted hearsay. When the court inquired whether the documents were being offered for their truth, the prosecutor responded: "No, Your Honor. They're not offered for the truth of the matters stated . . . . They're offered to show that these were documents given to this witness by this defendant to assist in her husband's visitation action." The court then excused the jurors and heard arguments on the matter.

Defense counsel argued that the documents constituted hearsay because they were not authored by the defendant and because the prosecutor had presented no evidence that the defendant was aware of their contents. He also contended that a proper foundation had not been laid for their admission. The prosecutor replied that the documents were relevant to show what the defendant was telling Tricia Gaul about the victim during the Gauls' probate litigation and would therefore shed light on the defendant's state of mind and her motive to kill the victim.

The trial court overruled defense counsel's objection on the ground that the documents had been "identified as a portion of the file that was given to this witness by the defendant for the express purpose of her reading it for use in her litigation and to educate her about

information concerning [the victim]. There's an inference there [that] the defendant knew that it was in the file, given by someone to read that information. It's not offered for the truth. I'm going to tell the jury it's not offered for the truth." When the jury returned to the courtroom, the court gave the following instruction: "I'm permitting the exhibits . . . not for the truth of the information set forth, but that it was part of the information given to this witness in this file that she described during her testimony. And you should consider it only for that purpose." Thereafter, the prosecutor read the document in full to the jurors and elicited testimony from Tricia Gaul that the defendant had advised the Gauls as to how to proceed during the probate litigation and had expressed her concern that the victim might adopt Rebecca or move out of the area with his family.

We conclude that, although the record is adequate for review, the defendant's claim must fail under the second prong of *Golding* because it is not of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Golding*, supra, 213 Conn. 239–40. Although the defendant claims on appeal that the trial court denied her the constitutional right to confront her accusers when it admitted Cynthia Carpenter's written account of her telephone conversation with the victim, she does not make a constitutional argument with respect to this evidence. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 153 n.19, 864 A.2d 666 (2004). In light of the fact that the defendant provides no analysis in support of her constitutional claim, we decline to

review it.[19] We also conclude that, because the court instructed the jurors that the written account of the telephone conversation was not admitted for the truth of the matter asserted, but solely to establish that the defendant gave Tricia Gaul certain information about the victim to educate and assist the Gauls in preparing for their litigation, it was not inadmissible hearsay under state evidentiary law. Accordingly, the trial court did not abuse its discretion by admitting the document into evidence.

The defendant argues that the information contained in the document was unduly prejudicial because it was used by the state to convince the jurors of her extreme dislike of the victim. The defendant contends that the state's theory that the defendant shared her mother's animosity toward the victim was attenuated, at best, and that the potentially prejudicial effect of the evidence was magnified because it came from the voice of a deceased person. She further maintains that the jury inevitably must have considered the document for its truth because its contents were similar to other evidence that the court admitted improperly. We disagree.

The defendant misrepresents the grounds on which the trial court permitted the state to introduce the document. Although the court observed that an inference could be made that the defendant was aware of its contents, the court admitted the document as evidence of information that the defendant had given to the witness to assist the Gauls' in their litigation, and not as evidence of the defendant's state of mind. This conclusion is supported by the trial court's ruling, its limiting instruction to the jury and Tricia Gaul's testimony

_____

[19] The only specific constitutional argument made by the defendant regarding this issue is the summary statement in her brief that "[t]he defendant was denied [her] constitutional right to cross-examine the victim and [Cynthia] Carpenter."

directly following the document's admission. In her testimony, Tricia Gaul stated that the defendant had advised the Gauls in the early stages of their probate action and had expressed her concern that the victim might move with Kim and Rebecca out of the area. The written account of the telephone conversation, in which the victim allegedly stated that he was going to adopt Rebecca and threatened to disappear with both Kim and Rebecca, would have been of interest to the Gauls and useful in preparing for their litigation. Accordingly, the document was relevant to understanding the Gauls' motivation in initiating a probate action of their own because the Gauls' attempts to obtain partial custody or the right to visit Rebecca would have been more difficult, if not impossible, had the victim adopted Rebecca or moved with his family out of the area.

Finally, with respect to the defendant's argument that the jurors considered the evidence for its truth regardless of the trial court's instructions, it is well established that, "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004). The defendant has not pointed to any concrete evidence that the jury did not follow the trial court's limiting instructions. Accordingly, we conclude that the court properly admitted Cynthia Carpenter's written account of her telephone conversation with the victim.

C

We next consider whether several investigative reports prepared by the department to assist the Probate Court in the custody litigation contained inadmissible hearsay. During the Probate Court litigation, Teresa L. Jenkins, a department investigator, interviewed Kim, the victim, the Clintons and the Carpenters concerning allegations of child neglect and abandonment made by

the defendant and Cynthia Carpenter in their applica-
tions for removal of guardianship and for immediate
temporary custody of Rebecca. On the basis of these
interviews, Jenkins later prepared three reports for use
by the court at three different stages in the proceedings.
These reports, which were required by the court and
which contained Jenkins' recommendations regarding
guardianship and custody of Rebecca, included infor-
mation concerning: (1) Kim's childhood, failed mar-
riages and relationships; (2) the victim's prior failed
marriage, decision to terminate his parental rights with
respect to a child born of that marriage, learning disabil-
ity and uneven employment history; and (3) Cynthia
Carpenter's concerns regarding Kim's inability to care
for Rebecca.[20]

Defense counsel objected to admission of the first
report, arguing that it was inadmissible hearsay and that

---

[20] Jenkins specifically reported: "[Cynthia] Carpenter reports that Kim was
born with PKU which required her to be on a special diet and that she had
other special needs. During Kim's childhood she was diagnosed as being
learning disabled which progressively worsened over the years. She furthe[r]
reports that people with PKU generally look to others to provide for them
as well as depend on them for their day to day needs.

"In addition, she reports that Kim has not demonstrated good judgement
in the past four months and she is saddened that things have reached this
point. She further states that she had been providing care for Rebecca off
and on since birth and that she has practically raised her herself."

With respect to the situation in November, 1992, Jenkins further reported:
"[Cynthia Carpenter] reports that Kim shows no interest in Rebecca or her
welfare and that Rebecca needed some stability in her life. In addition,
because of Kim's PKU, Rebecca is a special needs child and the effects on
her [have] not been positively determined."

After noting that the Probate Court had awarded temporary custody of
Rebecca to Cynthia Carpenter at the October, 1992 probate hearing, Jenkins
assessed Kim's response to the court's recommendations that she attend a
parenting course, visit with Rebecca twice a week and attend an early
intervention program to improve her parenting skills: "To date, Kim has
followed through with all the aforementioned recommendations. She states
that she is sad that things have reached this point, but that it is her responsibil-
ity to raise her daughter, not her mother's. She also states that she has had
to call her mother asking for permission to visit with Rebecca and on some
occasions she would be denied visits because of the conflict of time or day."

it was not relevant because it contained no references to the defendant. The state responded that the report was relevant to show the status and direction of the probate proceedings and the basis for Jenkins' recommendations.[21] Thereafter, the trial court determined that the report was relevant and admitted it as a business record. Two subsequent reports prepared by Jenkins also were admitted as business records.[22]

The defendant claims that Jenkins' investigative reports were inadmissible under the confrontation clause because they constituted testimonial hearsay statements as defined in *Crawford*. We conclude that the defendant's claim satisfies the first prong of *Golding* because the record is adequate for review, but that the claim must fail under *Golding*'s second prong because it is not of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Golding*, supra, 213 Conn. 239–40.

General Statutes § 52-180 (a) provides in relevant part: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter." See also Conn. Code Evid. § 8-4 (a). However,

---

[21] Jenkins recommended that temporary custody remain with Cynthia Carpenter for an additional thirty days, that Kim receive individual counseling and that Kim assume full responsibility for Rebecca while the child was in her care.

[22] Although the court did not expressly state that it was admitting the second two reports as business records, the colloquy between the court, the prosecutor and defense counsel indicated that the reports were admitted on the same grounds as the first report.

"[o]nce these criteria have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." (Internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 231, 733 A.2d 156 (1999).

In the present case, to the extent that the three investigative reports were admitted as business records to document Jenkins' ultimate recommendations regarding custody of Rebecca, they met the requirements of the business record exception to the hearsay rule. The reports constituted records of events that were relevant to the issues being tried and were made in the regular course of the department's business to investigate matters pertaining to probate proceedings. See General Statutes § 52-180 (a). Under *Crawford*, business records are identified as "statements that by their nature [are] *not* testimonial . . . ." (Emphasis added.) *Crawford* v. *Washington*, supra, 541 U.S. 55. Accordingly, admission of the reports to document Jenkins' ultimate recommendations to the Probate Court did not constitute a violation of the confrontation clause pursuant to *Crawford*.

Statements made to Jenkins by Kim, the victim, the Clintons and the Carpenters, however, insofar as they were included in the report to explain the *basis* for Jenkins' recommendations, fit within the core class of testimonial statements barred by *Crawford* because

they were made under circumstances that would lead an objective witness reasonably to believe that they would be available for use at a later trial. See id., 52. Jenkins testified that it was standard procedure for department investigators to interview family members in probate cases involving guardianship and custody disputes for the purpose of making findings and recommendations to the Probate Court. In her interviews, Jenkins asked the defendant and the Carpenters questions relating to the petitions and their allegations against Kim. She subsequently met with Kim and the victim to hear their side of the story as well. Her reports also indicate that at some point she met with the Clintons. These individuals knew that any information they provided to Jenkins during the interviews would be available for use in the probate litigation. Consequently, their statements were testimonial in nature and inadmissible under *Crawford* for purposes of the confrontation clause because all of the declarants except the victim were available to testify and because the defense had had no prior opportunity to cross-examine them. See id., 53–54.

We nevertheless conclude that improper admission of this evidence was harmless. Where a claim is of constitutional magnitude, "the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jenkins*, 271 Conn. 165, 189, 856 A.2d 383 (2004). "Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 399, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

In this case, we conclude that the constitutional violation was harmless beyond a reasonable doubt because

most of the information provided to Jenkins by Kim, the victim, the Clintons and the Carpenters pertained to the family backgrounds and marital histories of Kim and the victim, respectively, to Rebecca's special needs and to Cynthia Carpenter's concerns regarding Kim's deficient parenting skills. Moreover, the documents did not refer to conflicts between the victim and the Carpenters or contain any references to the defendant. In fact, the defendant objected to admission of the documents in part because they related solely to the probate litigation and did not refer to the defendant. Furthermore, the documents were admitted to explain the basis for Jenkins' recommendations to the Probate Court regarding guardianship and custody of Rebecca and were discussed at trial in that context. We therefore conclude that the information in Jenkins' investigative reports, which formed the basis for her recommendations, would not have influenced the judgment of the jury and was harmless beyond a reasonable doubt.

### D

We finally consider Dee Clinton's testimony that the victim repeatedly told her during the year before his murder that he intended to move to Arizona with Kim and Rebecca. On direct examination, Dee Clinton gave testimony regarding the victim and Kim and their ongoing conflict with the defendant and other members of the Carpenter family over custody and visitation issues. When the prosecutor asked the witness whether the victim had plans to move to a particular location, defense counsel objected on hearsay grounds and the court requested an offer of proof.

After the court excused the jurors, Dee Clinton testified that the victim had told her that he intended to move to Arizona with Kim, Rebecca and their newborn daughter, Brianna, and that he planned to look for employment in Arizona as a certified nurse's aid. He

also told her that the reason he intended to move to Arizona was that he was frustrated by the continuing litigation over Rebecca and had had enough of the Carpenter family. The state argued that the testimony should be admitted as circumstantial evidence of the victim's state of mind regarding his intent to move to Arizona. It contended that the evidence was relevant because the state would prove that the defendant was aware of the victim's intent to leave the area and, regardless of whether he actually did leave the area, the defendant's belief that he might do so constituted circumstantial evidence of her motive to kill the victim. The court agreed with the state that the victim's words, independent of their truthfulness, were admissible to show his state of mind and were relevant for their effect upon the defendant. The court thus ruled to permit the witness to testify regarding the victim's intent to move to Arizona.

Thereafter, defense counsel objected to the trial court's ruling on relevance grounds, arguing that the evidentiary foundation for admission of the testimony was inadequate because no evidence had been offered to show that the victim's alleged intent had been conveyed to the defendant. The prosecutor responded that future witnesses would testify that the Carpenter family knew of the victim's intention to leave the area and were upset by this information. Subsequently, Dee Clinton testified that the victim told the Carpenters "straight up" that he was going to leave the area, adopt Rebecca and move to a state where the Carpenters could not continue to pursue the visitation litigation, although she admitted that she had not been present when the victim allegedly made any of these statements. The court nonetheless ruled to admit the testimony.

After the jury returned to the courtroom, the witness testified that the victim initially told her about his plans to move to Arizona in July, 1993, and that he discussed

the matter with her repeatedly until the day he was murdered. To corroborate this evidence, the court permitted the state, over defense counsel's objection on hearsay grounds, to admit evidence of an envelope addressed to the victim from the Arizona State Board of Nursing. The envelope was postmarked December, 1993, and contained an application for a license to practice as a certified nurse's assistant in Arizona. On cross-examination, Dee Clinton testified that although the defendant had an interest in moving to Arizona, she did not know whether he had obtained a job, a place to live or a license to work in Arizona as a certified nurses' aid. She also testified that the defendant was planning to start a new job as a certified nurse's aid in Connecticut on March 21, 1994.

Tricia Gaul subsequently testified that the defendant had expressed concern that the victim might go away with Kim and Rebecca. Bonita Frasure, one of Clein's former law firm partners, also testified that the defendant told her that she was "concerned that . . . Rebecca would be taken away from her and her family and she wouldn't be able to see Rebecca again." Marilyn Rubitski, the office manager for Clein's law firm at the time, likewise testified that she had had many conversations with the defendant about Rebecca's case and that the defendant had told her that the victim was "threatening to not let them see Rebecca . . . ." Finally, Cynthia Carpenter's written account of her telephone conversation with the victim stated that the victim told her that "[i]f we ever want to see Kim or Rebecca again we need to cooperate with him or he would disappear with both of them."

The defendant claims that she was denied her sixth amendment right to confront her accusers when the trial court ruled to admit Dee Clinton's testimony about the victim's intention to move to Arizona because the victim's statements to his mother did not bear "adequate

'indicia of reliability.' " *Ohio* v. *Roberts*, supra, 448 U.S. 66. We disagree. Although the defendant's claim satisfies the first two prongs of *Golding* because the record is adequate for review and the claim is of constitutional magnitude alleging the violation of a fundamental right, we conclude that the claim must fail under the third prong of *Golding* because the defendant has not established that a constitutional violation clearly exists and clearly deprived her of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 239–40.

As previously stated, under the principles set forth in *Roberts*, a hearsay statement is admissible for purposes of the confrontation clause if the declarant is unavailable to testify and the statement bears "adequate 'indicia of reliability.' " *Ohio* v. *Roberts*, supra, 448 U.S. 66. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." Id. In the present case, the court admitted the disputed testimony as evidence of the victim's state of mind. Section 8-3 (4) of the Connecticut Code of Evidence permits the admission of "[a] statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed." Although state law governs whether evidence falls within an exception to the hearsay rule, federal law governs whether the exception is "firmly rooted" for confrontation clause purposes. *Lilly* v. *Virginia*, 527 U.S. 116, 125, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999).

We recently examined federal law with respect to this issue in *State* v. *Smith*, 275 Conn. 205, 234–35, 881 A.2d 160 (2005), and determined that "the state of mind exception to the hearsay rule . . . is firmly rooted [under federal law] for confrontation clause purposes.

The state of mind exception has been recognized by the Supreme Court since its decision in *Mutual Life Ins. Co.* v. *Hillmon*, 145 U.S. 285, 295–96, 12 S. Ct. 909, 36 L. Ed. 706 (1892), more than one century ago. Moreover, the exception has been codified as rule 803 (4) of the Federal Rules of Evidence and exists in every jurisdiction in the country, whether by statute, court rule, or common law tradition. *Hayes* v. *York*, 311 F.3d 321, 325 (4th Cir. 2002), cert. denied, 538 U.S. 979, 123 S. Ct. 1803, 155 L. Ed. 2d 669 (2003). Not surprisingly, every federal circuit that has considered the issue, including the United States Court of Appeals for the Second Circuit, has concluded that the state of mind exception is firmly rooted for confrontation clause purposes. See, e.g., *Horton* v. *Allen*, 370 F.3d 75, 85 (1st Cir. 2004), cert. denied, 543 U.S. 1093, 125 S. Ct. 971, 160 L. Ed. 2d 905 (2005); *Hayes* v. *York*, supra, 326; *Moore* v. *Reynolds*, 153 F.3d 1086, 1107 (10th Cir. 1998), cert. denied, 526 U.S. 1025, 119 S. Ct. 1266, 143 L. Ed. 2d 362 (1999); *Terrovona* v. *Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988); *Barber* v. *Scully*, 731 F.2d 1073, 1075 (2d Cir. 1984); *Lenza* v. *Wyrick*, 665 F.2d 804, 811 (8th Cir. 1981)." (Citation omitted; internal quotation marks omitted.)

In this case, Dee Clinton's testimony that the victim told her that he was intending to move to Arizona fits squarely within this firmly rooted exception to the hearsay rule. It therefore bears adequate indicia of reliability as articulated in *Roberts* and the defendant's constitutional claim must fail under the third prong of *Golding*.

The defendant also argues that the trial court committed nonconstitutional evidentiary error because there was an insufficient foundation for admission of the testimony. We agree. "The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay.

. . . This exclusion from hearsay includes utterances admitted to show their effect on the hearer. *State* v. *Gonzales*, 186 Conn. 426, 429, 441 A.2d 852 (1982) (testimony of officers offered not for truth of statements made over the police radio, but rather to show the effect of the broadcasts on their hearers is not barred by hearsay rule); *State* v. *Vennard*, 159 Conn. 385, 392, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971); see . . . C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 11.3.3, p. 324." (Citations omitted; internal quotation marks omitted.) *State* v. *Hull*, 210 Conn. 481, 498–99, 556 A.2d 154 (1989).

In the present case, the trial court determined that Dee Clinton's testimony regarding the victim's plans to move to Arizona was relevant because of its anxiety producing effect on the defendant, which might assist the jury in explaining her motive to kill the victim. The evidentiary foundation, however, was insufficient to admit the testimony for that purpose. "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 59, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Dee Clinton testified that she had had many conversations with the victim about his intention to move to Arizona, but the record contained no testimony that the defendant was present when he expressed such an intent. Although the court acknowledged this problem when defense counsel initially objected to admission of the testimony on grounds of relevance, it relied on the prosecutor's assurance that future witnesses would provide the required evidence that the defendant had knowledge of the victim's intent.

The promised evidence did not materialize. The testimony of Tricia Gaul and Frasure that the defendant was worried that the victim might take Rebecca away did not link specific statements by the victim that he intended to move to Arizona with the defendant's expressed concern, which could have been attributed to other statements made by the victim in her presence. Rubitski's testimony and Cynthia Carpenter's written account of the telephone conversation in which the victim allegedly threatened to prevent the Carpenters from seeing Rebecca also falls short of evidence that the defendant knew about the victim's specific intent to move to Arizona. The victim's threat could have meant that he would seek an order from the Probate Court to preclude the Carpenters from visiting Rebecca, that he would move to another town in Connecticut or that he would thwart visitation by the Carpenters in some unforeseen way. Indeed, this was a distinct possibility in view of Dee Clinton's testimony on cross-examination that the defendant had obtained a new job in Connecticut, which was scheduled to begin only eleven days after his murder. Accordingly, because the prosecutor failed to establish that the defendant had knowledge of the victim's intent to move to Arizona, there was an inadequate evidentiary foundation for admission of Dee Clinton's testimony regarding that issue. See, e.g., *Barnett* v. *Commonwealth*, 763 S.W.2d 119, 124 (Ky. 1988) (court improperly admitted victim's statement to show motive when record lacked evidence that defendant had heard it); *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759, 519 N.E.2d 587 (1988) (court deemed testimony irrelevant when record lacked evidence that victim's state of mind had been transmitted to defendant).

We conclude, however, that the improper evidentiary ruling was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant

bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). In the present case, we do not need to choose between the two formulations or decide whether there is any functional difference between them because we conclude that the defendant has not satisfied his burden of proving harm under either standard.

Dee Clinton's testimony was similar to the testimony of Frasure and Rubitski regarding the defendant's concern that the victim might disappear with Kim and Rebecca or take them away. In addition, the prosecutor did not refer in his closing argument to the jury to the victim's plans to move to Arizona, but only to the defendant's generalized concern about the victim leaving the area with Kim and Rebecca. Consequently, Dee Clinton's testimony was harmless because it was not likely to have distorted the jury's perception of the remaining evidence; see *Pagano* v. *Ippoliti*, 245 Conn. 640, 652, 716 A.2d 848 (1998); or to have affected the outcome of the trial. See *State* v. *Young*, supra, 258 Conn. 95.

III

The defendant's third claim is that the trial court committed evidentiary error and deprived her of her right to confront the witnesses against her under the sixth amendment to the United States constitution when it permitted Chris Despres to testify that his father

had told him that Clein hired him to kill the victim because "somebody wanted [the victim] dead . . . ." We disagree.

The defendant objected to admission of this testimony as hearsay when the state made its offer of proof, but did not object on constitutional grounds. To the extent that her constitutional claim was not properly preserved, the defendant seeks review under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review and that the defendant's claim is of constitutional magnitude. See *State* v. *Spencer*, 198 Conn. 506, 512–13, 503 A.2d 1165 (1986) (challenge to statements of coconspirator allegedly made in furtherance of conspiracy as hearsay implicates defendant's constitutional right of confrontation); see also *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). The claim fails to satisfy the third prong of *Golding*, however, because the defendant has not established that a constitutional violation clearly exists and clearly deprived her of a fair trial. See *State* v. *Golding*, supra, 239–40.

The following additional facts are necessary to our resolution of this claim. Chris Despres testified for the state on two separate occasions. During his first appearance, Chris testified that his parents were divorced and that he had lived with his mother until he was fourteen years old, but that he had moved in with his father in February, 1994, because he was not getting along with his mother. He also testified that between February and March, 1994, his father drove around the area, armed with a gun, hunting for the victim and intending to kill him. Chris accompanied his father on several of these occasions until the day his father saw a newspaper advertisement that the victim wanted to sell a tow truck. Chris then testified that his father telephoned the victim and arranged to meet him for the purpose of seeing the vehicle. He also described the events on the night of

the murder, which he witnessed from the passenger seat of his father's car. At this point in the proceedings, the court recessed for the day and the witness did not return to complete his testimony until one month later.

Prior to his second appearance, the state made an offer of proof with respect to Chris' proposed testimony that his father had told him that someone had told Clein that they wanted the victim dead and that Clein had hired his father to be the gunman. In response to defense counsel's objection to the testimony on hearsay grounds, the state argued that Despres' statement to Chris was admissible because it was made in the course of and in furtherance of the conspiracy between the defendant, Clein and Despres to kill the victim. After hearing arguments on the matter, the court ruled to permit the testimony under the coconspirator exception to the hearsay rule.

When Chris returned to the stand, he testified on direct examination that shortly after he moved in with his father, they happened to meet Clein at the grocery store. Chris did not speak to Clein because his father told him to go to another part of the store. When his father and Clein finished talking, Chris and his father went out to the car and Chris asked his father what he and Clein had been discussing. His father responded that Clein had asked him to kill somebody, whom he later identified as the victim, because Clein knew a person who "wanted the guy dead and [Clein] was going to make the connection . . . ." Chris also testified that Clein told his father that the target of the murder had been hitting, sexually abusing or putting out cigarettes on his wife or children.

On cross-examination, Chris testified that during the following days and weeks he and his father drove around the area in search of the victim. Chris testified that he knew his father wanted to kill the victim from

their very first outing and that his father was carrying a loaded gun. Altogether, Chris and his father went searching for the victim between six and ten times over a period of two to four weeks, usually in the evening when it was dark, in places where they thought the victim might be living or working. On one such occasion, his father got out of the vehicle and told Chris to drive his car around the parking lot of an apartment complex while he went looking for the victim on foot. Despres also told his son that he would kill the victim if the opportunity arose. On the night of the murder, Despres asked Chris if he wanted to shoot the victim, but Chris declined. Following the murder, Chris helped his father dispose of the murder weapon, which his father had smashed into pieces.

"The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 798. Nevertheless, "[i]t is well established that a coconspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause. . . . In order to invoke the coconspirator exception to the hearsay rule, [t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy. . . . The court must make its preliminary determination[s] by a fair preponderance of the evidence . . . . Moreover, the evidence will be construed in a way most favorable to sustaining the preliminary determinations of the trial court; its conclusions will not be disturbed on appeal unless found to be clearly erroneous. . . .

"[T]he in furtherance term implies . . . [that] the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy . . . or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity . . . . Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be in furtherance of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives . . . . Of course, whether a particular statement is made in the course of and in furtherance of the conspiracy depends upon the nature of the statement and all of the relevant facts and circumstances under which it was made." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 628–29, 841 A.2d 181 (2004).

The defendant argues that Despres' statement was not made for the purpose of recruiting Chris as a coconspirator or to gain his cooperation. She argues that Despres sent his son away when he spoke with Clein in the grocery store, did not volunteer the information about the conspiracy to his son, never asked his son to do anything in furtherance of the conspiracy and was not assisted by his son when he committed the crime. She contends that because Chris was a minor, there is no way of knowing whether he voluntarily accompanied his father when they drove around looking for the victim prior to the murder or whether he felt compelled to go with his father merely because of their relationship. She further contends that Despres

might have had a personal reason to tell Chris about his involvement in the crime, such as a need to impress him or to gain his respect, that would not have been in furtherance of the conspiracy. We are not persuaded.

Although "[a] statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely spills the beans, with no intention of recruiting the [nonconspirator] into the conspiracy does not further the conspiracy"; (internal quotation marks omitted) id., 629; "[t]he law does not require a conspirator to ask a third party expressly to do something to further the conspiracy in order for the statement to be admissible under the coconspirator exception to the hearsay rule. . . . Instead, [t]he standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy." (Citations omitted; internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 750, 760 A.2d 82 (2000).

In *United States* v. *Monroe*, 866 F.2d 1357, 1360 (11th Cir. 1989), a witness was permitted to testify that one of two coconspirators had made statements in his presence implicating both coconspirators in the crime. When the defendant challenged admission of his testimony on appeal, the government argued that the testimony was admissible under the coconspirator exception to the hearsay rule. Id. It contended that the statements made to the witness, who was not a coconspirator at the time, were " 'in furtherance of the conspiracy' " because he subsequently joined the conspiracy. Id., 1360–61. The government thus asserted that "the effect of these statements on [the witness], in conjunction with [the coconspirator's] . . . involvement in the conspiracy, effectively furthered the conspiracy." Id., 1361.

The defendant in *Monroe* responded that the witness' testimony did not indicate that the coconspirator had

attempted to persuade the witness to join the conspiracy or to act in any way in furtherance of its goals. Id., 1362. He argued that, although the witness conceded that he had subsequently assisted the coconspirator in committing the crime, there was no evidence that the coconspirator attempted to obtain the witness' aid at the time he initially told him about the planned crime. Id. The defendant thus contended that the coconspirator's statements to the witness were a casual admission of culpability to someone he had decided to trust. Id.

The Eleventh Circuit concluded, after a careful examination of the record, that the trial court properly had admitted the witness' testimony under the coconspirator exception to the hearsay rule. Id., 1363. In reaching that conclusion, the court noted that a liberal standard is applied in determining whether a statement is made in furtherance of a conspiracy. Id. The court also cited cases in which other jurisdictions had concluded that conversations between conspirators and prospective coconspirators for membership purposes may be considered acts in furtherance of the conspiracy and that statements can be made in furtherance of a conspiracy if meant to allay the suspicions or fears of others. Id.

In the present case, we similarly conclude that Despres' revelation of the conspiracy to Chris was in furtherance of the conspiracy because it reasonably can be viewed as the first step in gaining his son's cooperation, moral support, future assistance and guaranteed silence in the aftermath of the murder. An examination of the relevant facts and circumstances, including all of the events leading up to and following Despres' disclosure of the conspiracy to his son, suggests that there is no other logical explanation as to why Despres would have told him about the conspiracy after taking affirmative steps in the grocery store to prevent him from overhearing the conversation with Clein. Indeed, when Chris specifically asked his father about the conversation,

Despres probably realized that it would be difficult, if not impossible, to conceal the conspiracy from his son while the two were living together. It thus made sense to tell Chris about the plan for the purpose of enlisting his future cooperation and support and ensuring his silence following the murder.

Subsequent events support this interpretation. Although Chris did not testify as to how much time transpired between the initial conversation with his father and the first time he and his father went looking for the victim, he admitted that he knew on their initial trip exactly what his father was doing. Moreover, on one such trip, Chris assisted his father by driving the car in the parking lot of an apartment complex while his father searched for the victim on foot. In a final demonstration of trust and reliance on his son, Despres offered to let Chris kill the victim on the night of the murder, an opportunity Chris declined. Thereafter, Despres successfully solicited his son's assistance in disposing of the murder weapon. Accordingly, we conclude that the trial court did not abuse its discretion by admitting evidence of Despres' statements to his son and that the defendant's claim must fail under the third prong of *Golding* as well as under state evidentiary law. See *State* v. *Pelletier*, 209 Conn. 564, 577–78, 552 A.2d 805 (1989) (comments of codefendant to wife following commission of robbery and murder when codefendant returned home deemed in furtherance of conspiracy and admitted by court because codefendant intended comments to lessen emotional trauma of killings and to gain wife's cooperation in hiding stolen property); see also *United States* v. *Mayberry*, 896 F.2d 1117, 1122 (8th Cir. 1990) (comments to third party indicating imminent commission of crime reasonably construed as seeking witness' assistance, cooperation and silence and thus deemed in furtherance of conspiracy).

## IV

The defendant's fourth claim is that the trial court committed evidentiary impropriety and deprived her of her right to present a defense under the sixth amendment to the United States constitution when it excluded the testimony of Jocelyn Johnson, Despres' girlfriend for twelve and one-half years, that Despres had told her that Clein threatened to kill him if he did not go through with the murder. The defendant sought to admit this evidence under the coconspirator exception to the hearsay rule. On appeal, the defendant argues that this testimony would have proven that Despres did not murder the victim for pecuniary gain and may have committed the murder under duress. We are not persuaded.

Although the defendant preserved her claim under state evidentiary law, she did not object to the trial court's ruling on constitutional grounds. She therefore seeks review under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review and that the claim alleges the violation of a fundamental right. See *State* v. *Sandoval*, 263 Conn. 524, 546, 821 A.2d 247 (2003) (restrictions on testimony of defense witness in criminal trial may deprive defendant of constitutional right to present defense); *State* v. *Barletta*, 238 Conn. 313, 322, 680 A.2d 1284 (1996) (same). The claim fails to satisfy the third prong of *Golding*, however, because the defendant has not established that a constitutional violation clearly exists and clearly deprived her of a fair trial.

The following additional facts are relevant to our resolution of this claim. Johnson testified on direct examination that she and Despres had three conversations regarding the victim's murder during which Despres discussed his intention to commit the crime and expressed his views about how things were going. When defense counsel asked Johnson if Despres had told her

that Clein hired him to murder the victim, the state objected. The court then excused the jury and the defense made an offer of proof.

Johnson testified that, in their first conversation, Despres told her that Clein had asked him to kill the victim for $3000. Despres also told her that Clein said that he was representing someone who was concerned about a child in the victim's custody, whom the victim was sexually abusing, and that he was going to take care of it himself because the court was not taking care of the matter.

Johnson then testified that in their next conversation, which she portrayed as "a couple comments about how [things were] going," Despres told her that he was having a difficult time identifying the victim from a photograph given to him by Clein. He also said that Clein was aggravated that the murder had not yet taken place and threatened that Despres would be "next" if he did not carry it out. Johnson testified that Despres gave her the impression that he did not want to go through with the murder, but said that he could not afford to reimburse Clein for money Clein had advanced him to purchase the car and the gun. Johnson further testified that when Despres talked to her about these matters she "didn't believe him." Consequently, the court precluded defense counsel from asking Johnson what Despres had told her concerning his intention to kill the victim and how things were going prior to the murder.

Several days later, defense counsel raised the issue again when he proposed to offer that portion of Johnson's testimony indicating that Clein was taking it upon himself to kill the abuser as a statement against the penal interest of Clein and Despres. The state informed the court that if the defense was permitted to offer Johnson's testimony as a statement against penal interest, it would ask the court's permission to introduce

several written statements authored by Despres to impeach his credibility. After defense counsel requested that it be allowed to see Despres' written statements and to obtain an advance ruling from the court regarding their admissibility, the court determined that Despres was an unavailable witness and that "the testimony of . . . Johnson would lay the foundation for her conversations with . . . Despres to come in as a statement against his penal interest." The court ruled that the evidence was admissible, but determined that if the defense introduced Despres' statements to Johnson, the state would be allowed to impeach them with Despres' written statements indicating that Despres had worked in concert with Clein and the defendant. As a result of these rulings, defense counsel informed the court that it would not call Johnson as a witness.

The state first argues that the trial court did not exclude the contested portion of Johnson's testimony, and, consequently, that there is no adverse ruling for this court to review. The state's argument is predicated on the assumption that the trial court's ruling to admit certain evidence against the penal interest of Clein and Despres, which defense counsel subsequently decided not to introduce, included Clein's alleged threat to Despres. When the court asked defense counsel to identify those portions of Johnson's testimony that it wanted to offer as statements against penal interest, however, defense counsel expressly designated the testimony that Clein was taking it upon himself to kill the abuser, and did not mention Johnson's testimony that Clein had threatened to kill Despres if he did not carry out the murder. Accordingly, the trial court's ruling to admit evidence against the penal interest of Clein and Despres did not include Johnson's testimony regarding the threat and this court must review the defendant's claim.

We begin our analysis by setting forth the applicable legal principles. "The federal constitution require[s]

that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Thus, our law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"Finally, [i]t is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Sandoval*, supra, 263 Conn. 541–43.

Guided by these and other legal principles discussed in part III of this opinion pertaining to the coconspirator exception to the hearsay rule, we conclude that the trial court did not abuse its discretion by excluding Johnson's testimony that Clein threatened Despres prior to the murder. Despres' statements to Johnson did not promote the goals of the conspiracy by reassuring a coconspirator, did not foster the cohesiveness of the conspiracy and did not inform a coconspirator about

the progress of the conspiracy. See *State* v. *Peeler*, supra, 267 Conn. 628–29. Moreover, Despres' statements to Johnson cannot be viewed as the first step in an effort to recruit her, as in the case of the statements he made to his son. Johnson portrayed the conversation not as a serious discussion, but as "a couple comments about how [things were] going." Furthermore, she testified that she did not even believe what Despres was saying. His comments thus were more akin to a casual reference to what was happening in his life than an attempt to induce Johnson to take part in the conspiracy. See *State* v. *Peeler*, supra, 267 Conn. 629 ("[a] statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely spills the beans, with no intention of recruiting the [nonconspirator] into the conspiracy does not further the conspiracy" [internal quotation marks omitted]).

Insofar as the defendant claims that Despres' statements to Johnson regarding Clein's threatening remarks prior to the murder were admissible to show Despres' state of mind, we decline to review this claim. The defense offered the testimony of Johnson regarding Despres' statement as to Clein's purported threat prior to the murder under the coconspirator exception to the hearsay rule. The trial court thus ruled upon the admission of Johnson's testimony that Clein was threatening to kill Despres under the legal principles applicable to the coconspirator exception, rather than the state of mind exception, to the hearsay rule.[23] Consequently, we conclude that the trial court did not abuse its discretion in excluding Despres' remarks to Johnson as impermissible hearsay and that the defendant cannot prevail on this claim.

[23] The transcript clearly reflects that the defendant offered statements made by Clein to Despres *prior to* the murder under the coconspirator exception to the hearsay rule. The defendant offered other statements made by Clein to Despres *following* the murder under the state of mind exception to the hearsay rule.

V

The defendant's fifth claim is that the trial court committed evidentiary error and deprived her of her right to present a defense under the sixth amendment to the United States constitution when it excluded evidence of a telephone call to a nationally syndicated radio talk show from a male caller who identified himself as "Chris" and confessed to a murder allegedly committed by his father. This claim has no merit.

As in the case of her other constitutional claims, the defendant properly objected to the trial court's ruling, but failed to preserve her claim on constitutional grounds. She therefore seeks review under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. In this instance, we conclude that the record is adequate for review, but that the claim is not of constitutional magnitude alleging the violation of a fundamental right because the issue of whether the tape recording was authenticated properly is purely evidentiary in nature. See *State* v. *Swinton*, supra, 268 Conn. 833 ("foundational questions are generally of an evidentiary nature"); *State* v. *Morales*, 78 Conn. App. 25, 48, 826 A.2d 217 ("defendant's claim regarding the admission of [certain] statements does not raise any constitutional questions but, rather, is merely an evidentiary claim relating to authentication"), cert. denied, 266 Conn. 901, 832 A.2d 67 (2003). We therefore consider whether the defendant may prevail under state evidentiary law.

The following additional facts are relevant to our resolution of this claim. Prior to selection of the jurors, Mark Despres' attorney sent the state a tape recording of a telephone call to the Dr. Laura Schlessinger radio program from a male caller who identified himself as "Chris."[24] The caller stated that he had been involved

[24] Mark Despres' attorney received the tape recording from an attorney representing Johnson, who had obtained it from the internet at Despres' request.

in a murder for hire when he was fifteen years old and that he was " 'the one [who] actually did it.' " The state provided defense counsel with a copy of the tape recording and advised the defense that Chris Despres had denied that he was the caller. The state ultimately obtained from the radio station another copy of the tape recording of superior quality, which it shared with the defense. The state also subpoenaed records containing the telephone numbers from which thousands of telephone calls had been made to the Dr. Laura Schlessinger radio program on December 13, 2000, the date of the call from "Chris." The state found no evidence that any of the calls originated in Connecticut.

The defense nonetheless attempted to attack the credibility of Chris Despres, who had accompanied his father when he shot and killed the victim, by playing the tape-recorded statement in which the caller identified as "Chris" declared that he had been involved in a murder for hire and was the one who had killed the victim. Defense counsel thus requested that the court order Chris Despres to provide a voice exemplar and that the defense be allowed to play the tape recording during his cross-examination. Thereafter, the court listened to the tape recording and compared it with Chris Despres' voice as heard during his testimony on direct examination. The court concluded that the "[a]dmissibility of the tape [turned] on the issue of authentication" and that the defense had not made a prima facie showing that Chris Despres was the caller. The court thus sustained the state's objection and did not permit the defense to introduce the tape recording into evidence.

In its memorandum of decision on the issue, the trial court explained that, "[a]part from the speaker's voice, the tape presents a mixture of circumstantial factors bearing on the question of authentication. Supporting authentication are: (1) the caller's identification of himself as 'Chris'; (2) the description of the crime as a

murder for hire; (3) the statement that the crime occurred when the caller was fifteen; and (4) . . . on the date of the call, December 13, 2000, the caller was married. Factors contrary to authentication are: (1) at the time of the call, none of the calls being received by the radio program originated from a Connecticut telephone facility; (2) the Dr. Laura [Schlessinger] program, being a national radio program, receives many telephone calls from throughout the country; and (3) Despres' denial of being the caller, as well as his assertion that in December, 2000, he was in the midst of marital discord." The court determined that none of the circumstantial evidence was conclusive and that authentication of the tape recording thus came down to an identification of the speaker's voice. The court also observed: "The defense has not offered testimony from anyone who claimed to be familiar with Chris Despres' voice to identify the voice on the tape as his."

Lacking testimony from a person familiar with Chris Despres' voice, the court compared the voice on the tape recording with Chris Despres' voice, as heard during his testimony in court, and concluded that it was not clear that the two voices were the same. "To the contrary, the two voices sound different. Part of that difference could be attributable to the nervousness displayed in the voice of the caller on the tape. In addition, the tape was recorded December 13, 2000, which was fourteen months before [Chris] Despres testified. [Chris] Despres was twenty-three years old at the time of his testimony. Nevertheless, the timbre of the voices [is] different. . . . [T]he cadence of speech is different. . . . Finally, the manner of expression [is] different. While the tape is short, the caller appears to have better diction than [Chris] Despres displayed during [his] testimony. On the other hand, the court cannot with certainty rule [him] out . . . as the caller. After

comparison and reflection, the court finds that [Chris] Despres is probably not the caller."

Section 1-3 (a) of the Connecticut Code of Evidence provides: "Preliminary questions concerning the qualification and competence of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court." Section 9-1 (a) of the Connecticut Code of Evidence further provides: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." See also *State* v. *Brown*, 163 Conn. 52, 57, 301 A.2d 547 (1972).

It is well established that "[a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

"Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Internal quotation marks omitted.) *State* v. *Colon*, supra, 272 Conn. 188–89.

We conclude that the trial court did not abuse its discretion in determining that the defendant failed to make a prima facie showing that the voice on the tape recording was that of Chris Despres. None of the calls received by the radio program around the time of the disputed call originated from a Connecticut telephone facility, the Dr. Laura Schlessinger program is broadcast

nationally, receiving thousands of calls from throughout the country, and Chris Despres denied being the caller. Moreover, in the absence of testimony from a person familiar with Chris Despres' voice to authenticate the voice on the tape recording, the court conducted its own comparison and determined that the voices were not the same. See *Ricketts* v. *Hartford*, 74 F.3d 1397, 1411 (2d Cir. 1996) (court based decision to exclude tape recording of police radio transmission on in-court analysis of voices); *United States* v. *Sliker*, 751 F.2d 477, 499 (2d Cir. 1984) (court based decision to admit tape recording of telephone conversation on in-court comparison of voices). The trial court relied on evidence that the two voices differed in timbre, cadence, sophistication of expression and diction in concluding that they were dissimilar. Furthermore, there was no evidence regarding where the telephone call originated, no indication of the caller's age when he made the call and no reference in the call to any details concerning the murder to assist in authenticating the recording. Accordingly, we conclude that the trial court did not abuse its discretion in excluding evidence of the tape recording and that the defendant's claim must fail.

## VI

The defendant's sixth claim is that the trial court committed evidentiary error and deprived her of her right to present a defense under the sixth amendment to the United States constitution when it excluded the testimony of two witnesses who would have testified regarding her state of mind prior to the murder. We disagree.

The defendant preserved her claim as evidentiary error, but failed to object on constitutional grounds. She therefore seeks review under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review, and that the claim

alleges the violation of a fundamental right. See *State v. Sandoval*, supra, 263 Conn. 546 (restrictions on testimony of defense witness in criminal trial may deprive defendant of constitutional right to present defense). The claim fails to satisfy the third prong of *Golding*, however, because the defendant has not established that a constitutional violation clearly exists and clearly deprived her of a fair trial. We examine each of the defendant's claims in turn.

A

The defense sought to enter the testimony of Diana Hendelman, a friend of the defendant since 1990, that the defendant had never mentioned the probate litigation regarding guardianship and custody of Rebecca. Hendelman and the defendant often went shopping together, met for lunch and dinner, worked out at the gym and talked on the telephone. When defense counsel asked Hendelman if the defendant had ever mentioned a family dispute concerning Rebecca, the state objected on hearsay grounds. The court excused the jury and defense counsel made an offer of proof, arguing that Hendelman's testimony was relevant as evidence of the defendant's state of mind to rebut the state's allegations that the defendant was upset about the custody dispute in December, 1993. Although defense counsel explained that the only information it intended to elicit from Hendelman was that the defendant never had mentioned Rebecca or the custody litigation during any of their conversations, the court sustained the state's objection to the testimony as inadmissible hearsay.

Our analysis is guided by the legal principles previously described pertaining to the defendant's sixth amendment right to present a defense, our well established rules of evidence and our deference to the trial court's rulings on evidentiary matters unless there has been a clear abuse of its discretion. See part IV of this

opinion. We are also guided in the present claim by our rules on the admission of hearsay testimony.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. . . . An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted. . . . C. Tait & J. LaPlante, [Connecticut Evidence (2d Ed. 1988)] § 11.3.2." (Citations omitted; internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 237–38, 690 A.2d 1370 (1997). A "statement," as that term is used in the hearsay rule and its exceptions, is defined in § 8-1 (1) of the Connecticut Code of Evidence as "(A) an oral or written assertion or (B) nonverbal conduct of a person, if it is intended by the person as an assertion." The commentary to the rule further explains that "[t]he effect of this definition is to exclude from the hearsay rule's purview nonassertive verbalizations and nonassertive, nonverbal conduct." Conn. Code Evid. § 8-1 (1), commentary. Moreover, in *State* v. *Vitale*, 197 Conn. 396, 405, 497 A.2d 956 (1985), we concluded that where silence is offered as nonverbal conduct, such evidence is inadmissible unless it is "a reliable indicator of what the [profferring party] claims it tended to communicate . . . ."

Applying these principles, we conclude that the trial court did not abuse its discretion in excluding Hendelman's testimony. Hendelman would have testified that the defendant failed to mention the ongoing probate litigation in any of their conversations, the implication being that the defendant's silence indicated her lack of concern about the custody dispute in the month of December, 1993, when she allegedly asked Clein to kill the victim. There is no reason to believe, however, that the defendant's silence was a reliable indication that she was not concerned about the litigation. The defense

offered no evidence that the defendant would have been likely to discuss the probate litigation with Hendelman, that she ever discussed the probate litigation with Hendelman or that she had discussions with Hendelman about related matters in which she would have been likely to express her concerns, if any, about the litigation. Accordingly, her failure to mention the probate litigation to Hendelman cannot be construed as a reliable indicator of her attitude toward the custody dispute because her silence could have been explained by other factors. See *State* v. *King*, 249 Conn. 645, 673, 735 A.2d 267 (1999) (child's failure to respond when asked if she saw perpetrator in photographic array was too ambiguous a response to warrant admission as nonverbal assertion that she did not see perpetrator in array). We therefore conclude that the trial court did not abuse its discretion when it excluded Hendelman's testimony as inadmissible hearsay. Accordingly, the defendant's constitutional claim must fail under the third prong of *Golding* as well as under state evidentiary law.

## B

The defense also sought to offer the testimony of Mary Sneed, a tailor, who stated that she had known the Carpenter family for twenty-five years and that the defendant was a client whom she saw two or three times a month. Sneed testified that she had asked the defendant about Rebecca in December, 1993, while the defendant was visiting her shop. When defense counsel queried Sneed more closely about their conversation, however, the state objected on hearsay grounds. After the court excused the jury, defense counsel made an offer of proof.

Defense counsel asked Sneed: "What did you ask [the defendant] regarding Rebecca at the time she came to see you in December of 1993?" Sneed replied: "I asked her how the visitation was going with her parents. She

said at that point that everything was straightened out and squared away, everyone was happy and she seemed to be in a nice frame of mind." Defense counsel argued that Sneed's testimony was admissible under the state of mind exception to the hearsay rule, but the state objected on the grounds that her testimony was not relevant and was inadmissible hearsay. The trial court sustained the state's objection to the testimony because it constituted "a self-serving statement of the defendant. . . . I don't see what she asks [as] being relevant unless the response comes in, so I'll sustain the objection to the pending question as well."

Although an out-of-court statement is not hearsay when it is offered to illustrate the declarant's then present state of mind, such a statement may be inadmissible "if the statement was not made in a natural manner, in apparent good faith and without reason for fabrication. . . . Furthermore, the out-of-court statement must be offered *exclusively* as evidence of the declarant's state of mind." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Bova*, supra, 240 Conn. 238.

We conclude that the trial court did not abuse its discretion in excluding Sneed's testimony. The defendant's statement that "everything was straightened out and squared away, everyone was happy" does not fall within the state of mind exception to the hearsay rule because it cannot be viewed *exclusively* as evidence of the defendant's state of mind. See *State* v. *Bova*, supra, 240 Conn. 238; 6 J. Wigmore, Evidence (Chadbourn Rev. 1976) § 1790, p. 320. The statement was made in reply to Sneed's question as to how the visitation with her parents was going. It thus reflected, at the very least, her perception that her family was satisfied with the present state of affairs. Whether her comment that "everyone was happy" was intended to include herself is open to speculation, but, even if it

was, her use of the word "everyone" meant that she was not referring *exclusively* to herself. Accordingly, in view of the trial court's broad discretion to rule on the relevance and admissibility of evidence, and mindful of our presumption in favor of upholding the trial court's rulings; *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998); we conclude that the court did not abuse its discretion in excluding Sneed's testimony.

## VII

The defendant's final claim is that the trial court improperly charged the jury on the elements of capital murder for hire. See General Statutes § 53a-54b (2).[25] The defendant argues that the court failed to advise the jurors that the state was required to prove that Despres intentionally killed the victim for pecuniary gain and that Clein intended the victim's death when he hired Despres. The state responds that the trial court's instruction to the jury, when considered in its entirety, did not omit any elements of the charged offense and fairly presented the case to the jury. We agree with the state.

The defendant concedes that she did not file a request to charge on the elements of murder for hire and did not take exception to the charge as given. "It is well established that [t]his court is not bound to review claims of error in jury instructions if the party raising the claim neither submitted a written request to charge nor excepted to the charge given by the trial court." (Internal quotation marks omitted.) *State* v. *Romero*, 269 Conn. 481, 487, 849 A.2d 760 (2004). The defendant therefore seeks review under *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40. We agree with the defendant that the first two prongs of *Golding* are satis-

---

[25] General Statutes § 53a-54b (2) provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . murder committed by one who is hired by the defendant to commit the same for pecuniary gain . . . ."

fied because the record is adequate for review and the claim is of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Schiappa*, 248 Conn. 132, 165, 728 A.2d 466 (claim challenging propriety of jury instructions for failure to charge on elements of offense is constitutional in nature), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). We conclude, however, that the claim must fail under the third prong of *Golding* because the defendant has not established that the alleged constitutional violation clearly exists and clearly deprived her of a fair trial.

The following additional facts are necessary to our resolution of this claim. In its final instructions to the jury, the trial court began its charge on capital felony murder by reading from the information, which alleged that the defendant, "with intent to cause the death of [the victim], solicited, requested and importuned . . . Clein to hire another person for pecuniary gain to kill [the victim], and . . . Clein did so hire . . . Despres who . . . as a result of having been so hired, did cause the death of [the victim] by shooting him." The court then advised that, in order for the jury to find the defendant guilty of the offense, the state must prove beyond a reasonable doubt: "One, that the defendant hired another person to cause the death of the victim for pecuniary gain. Two, both the defendant and the person hired intended to cause the death of the victim. And three, that the person hired intentionally caused the death of the victim . . . ."

Thereafter, the court explained the three elements of the offense[26] in greater detail and then summarized

---

[26] With respect to the first element the court instructed: "The first element is that the defendant hired another person to cause the death of the victim . . . for pecuniary gain. *Hired* means a relationship when one person engages the services of another who, for compensation, agrees to perform specified services. *Pecuniary gain* means gain in the form of money. This means that the defendant engaged the killer to murder the victim in exchange for money. In other words, the state must prove beyond a reasonable doubt that there was an agreement between the defendant and the person hired—

them as follows: "[I]n order for you to find the defendant guilty of capital felony as alleged in the first count, the state must prove beyond a reasonable doubt that, one, the defendant, through . . . Clein, hired . . . Despres to cause the death of the victim for pecuniary gain, and, two, both the defendant and . . . Despres had the intent to cause the death of the victim, and, three, acting with that intent . . . Despres . . . caused the death of the victim."

We begin by setting forth the applicable standard of review. "The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component

in this case . . . Despres—to cause the death of [the victim] and to pay the person hired monetary compensation.

"It is not necessary that the state prove that the defendant herself directly dealt with and hired for payment of money . . . Despres to kill the victim. The state alleges that the defendant did solicit, request and importune . . . Clein to hire a person to kill the victim. The state has the burden to prove beyond a reasonable doubt that the defendant did either solicit, request or importune . . . Clein to hire, for payment of money, a person to kill the victim, and that . . . Clein did hire for payment of money . . . Despres to kill the victim as solicited, requested or importuned by the defendant." (Emphasis in original.)

With respect to the second element the court instructed: "The second element of murder for hire is that the state must prove beyond a reasonable doubt that both the defendant and the person allegedly hired, in this case . . . Despres . . . had the intent to cause the death of the victim . . . . To satisfy this second element, the state must prove that both the defendant and the person allegedly hired . . . Despres . . . had the intent to cause the death of the victim . . . ."

The court finally instructed with respect to the third element: "The third element of murder for hire that the state must prove beyond a reasonable doubt is that the person allegedly hired . . . Despres . . . caused the death of the victim . . . . This means that you must find that [the victim] died as a result of the actions of . . . Despres and that such actions were taken with intent to cause the victim's death."

parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Romero*, supra, 269 Conn. 487–88.

We conclude that the trial court properly instructed the jury that the state must prove beyond a reasonable doubt that Despres intentionally killed the victim for pecuniary gain and that Clein intended the victim's death when he hired Despres. Bearing in mind that the instructions must be considered in their entirety and are "not to be critically dissected for the purpose of discovering possible inaccuracies of statement . . . [or] judged in artificial isolation from the overall charge"; (internal quotation marks omitted) *State* v. *Colon*, supra, 272 Conn. 342–43; there can be no doubt that the court properly advised the jury on all of the elements of murder for hire. The court read the information to the jury at the outset of its instructions, as follows: "[the defendant] . . . with intent to cause the death of [the victim], solicited . . . Clein to hire another person for pecuniary gain to kill [the victim], and . . . *Clein did so hire . . . Despres who . . . as a result of having been so hired*, did cause the death of [the victim] . . . ." (Emphasis added.) The phrases "did so hire" and "having been so hired," as applied to Clein and Despres, incorporate the conditions under which the defendant solicited Clein to hire Despres, these being an intent to cause the death of the victim

and an agreement on the part of the hiring party and the party so hired that the gunman would cause the death of the victim in exchange for monetary compensation. See *State* v. *McGann*, 199 Conn. 163, 176, 506 A.2d 109 (1986) (essential element of § 53a-54b [2] is agreement between hiring party and person hired that latter will be compensated for services).

Moreover, the court repeatedly advised in its remaining instructions to the jury on murder for hire that the state must prove beyond a reasonable doubt that the defendant, through Clein, hired Despres for the purpose of causing the victim's death for pecuniary gain. In discussing the first element of the crime the court specifically advised: "*Hired* means a relationship when one person engages the services of another who, for compensation, agrees to perform specified services. *Pecuniary gain* means gain in the form of money. This means that the defendant engaged the killer to murder the victim in exchange for money. In other words, the state must prove beyond a reasonable doubt that there was an agreement between the defendant and the person hired—in this case . . . Despres—to cause the death of [the victim] and to pay the person hired monetary compensation. . . . The state has the burden to prove beyond a reasonable doubt that the defendant did either solicit, request or importune . . . Clein to hire, for payment of money, a person to kill the victim, and that . . . Clein did hire for payment of money . . . Despres to kill the victim as solicited, requested or importuned by the defendant." (Emphasis in original.)

The foregoing instructions clearly directed that, in order for the jury to find the defendant guilty, it must find that the defendant solicited Clein to hire Despres for the express purpose of killing the victim for pecuniary gain, that Clein hired Despres for such a purpose and that Despres subsequently killed the victim for pecuniary gain. Accordingly, we conclude that the trial

court properly instructed the jury on the elements of murder for hire and that the defendant's claim must fail under the third prong of *Golding* because there is no reasonable possibility that the jury was misled.

The judgment is affirmed.

In this opinion the other justices concurred.